RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0057p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

PARMDIP SINGH,

*Petitioner,*

*v.*

No. 03-3546

JOHN ASHCROFT, Attorney General,

*Respondent.*

On Petition for Review of an Order of the Board of Immigration Appeals.
No. A73 640 434.

Argued: December 6, 2004

Decided and Filed: February 8, 2005

Before: MARTIN and MOORE, Circuit Judges; BELL, Chief District Judge.[*]

---

**COUNSEL**

**ARGUED:** Mark Jacob Thomas, MARK JACOB THOMAS ASSOCIATES, Chicago, Illinois, for Petitioner. Nancy E. Friedman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Mark Jacob Thomas, MARK JACOB THOMAS ASSOCIATES, Chicago, Illinois, for Petitioner. Nancy E. Friedman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. Petitioner Parmdip Singh ("Singh") petitions for review of an order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") decision to deny Singh's claims for asylum and withholding of removal under the Immigration and Nationality Act ("INA") and for relief under the Convention Against Torture. Specifically, Singh asserts that the IJ erred in finding his testimony incredible and in refusing to permit an expert witness to testify. Although we **DENY** the petition for review of the BIA's decision with respect to Singh's INA-based claims for asylum and withholding of removal, the IJ's failure to make a finding as to Singh's credibility regarding his allegations of torture requires us to

---

[*]The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

1

**VACATE** the judgment of the Board of Immigration Appeals with respect to Singh's Convention Against Torture claim and **REMAND** for further proceedings.

## I. BACKGROUND

Singh is a Sikh who formerly lived in Bhila, a village in the Punjab province of India. Singh's father served as head ("sarpanch") of Bhila for fifteen years and owned a sixty-five acre dairy farm and some smaller holdings in other cities. Singh claims that he was a nationally-known university, and later professional, wrestling champion.

In the mid-1980s, tensions developed in Punjab between the government and Sikh separatists who sought to establish the independent state of Khalistan. While it appears that Singh and his father may have supported the Khalistan independence movement generally, Singh's testimony suggests that they were not members or willing supporters of the Khalistan Liberation Front ("KLF"), a Sikh separatist group that used violent methods in advancing its cause. According to Singh, the KLF had many supporters in Bhila, and the KLF would frequently come to his family's home, demanding money, food, and shelter.

In 1984, approximately two weeks after Indira Ghandi was assassinated by Sikh extremists, the police arrested Singh, apparently believing that he was a KLF supporter. Singh claims that he was imprisoned for eighteen days, during which he was interrogated, stripped, and beaten. According to Singh, he was thrown to the ground on his stomach, police jumped on his back, and his hands were tied behind him and pulled up in the air. In addition, two men apparently grabbed Singh's legs and pulled them apart, and another man beat his head, feet, and other parts of his body with a stick. Singh claims that he suffered from internal bleeding, blood in his urine, varicose veins, and blood clots in his legs as a result of these beatings. During the last four days of his imprisonment, Singh allegedly was placed in a van and driven around Bhila so that he could point out two KLF leaders, Kaldeep Singh ("Keepa") and Haripal Singh ("Pal Tandra"), to the police. Singh says that he was released after his father paid a bribe to the police and that he was told that he must continue reporting KLF activities to the police.

Singh claims that he was arrested for a second time in March 1985. According to Singh, the police came to his home in the early morning hours, took him from his bedroom, and drove him to the police station in handcuffs. The police commander interrogated him as to the whereabouts and activities of Keepa and the KLF. When Singh denied having knowledge of such matters, the police allegedly slapped and punched him. Singh also asserts that the police commander threatened to bind his legs together with a rope and tie him to a car.

Singh's third arrest came in July 1985. Singh claims that police informants falsely accused him of raising money for the KLF. According to Singh, the police informants smuggled drugs for the police, and he was arrested so that the police and their informants could cover up how they were obtaining their income. Singh claims he was beaten across his back with a large belt, which caused bleeding and bruising. After his father paid a bribe, Singh was released.

In October 1988, Singh was again arrested by the police and held for four days. Singh claims the police accused him of supporting the KLF and conspiring to overthrow the government. During his imprisonment, Singh apparently was interrogated, his legs were pulled apart and tied down, and he was beaten with a wooden baton on his legs and back. Singh claims that, when he was released, the police threatened him that he would never walk again if he did not cooperate with them.

After being released from police custody, Singh sought employment as an electrician, having retired from wrestling apparently because of injuries to his legs.[1] Singh, however, was denied employment, allegedly because the Senior Police Detective in Punjab informed the Electrical Board that Singh was a terrorist. Singh then spent the next four years working on his father's land. During this time, Singh was required to report to the Senior Police Detective and inform him of any unusual activities occurring in Bhila.

According to Singh, his difficulties with the Punjabi police continued throughout the early 1990s. Singh claims that, in May 1991, following the assassination of a former prime minister's son, he was taken into custody along with several other young men from Punjabi villages and was interrogated for six hours. During the 1992 elections, Singh's home was searched by police looking for KLF materials and weapons. And in early 1993, Singh allegedly was summoned by the Senior Police Detective and ordered to cooperate in the police's efforts against terrorists. According to Singh, he was threatened at gunpoint during his meeting with the Senior Police Detective and was told that if he did not cooperate, he would be killed. For the next several months, Singh was forced to drive around Punjabi villages pointing out KLF members and supporters.

In June 1993, Keepa, one of the KLF's leaders, was killed. According to Singh, he was not directly involved in Keepa's death, but he had informed the police that Keepa had left the Bhila area. Singh alleges that he became a KLF target because of his role as a police informant and that the KLF kidnapped his wife for several hours as a warning to Singh. The following month, the KLF allegedly came to Singh's home and threatened to kill his family if Singh did not cooperate by bombing the Senior Police Detective. Singh told the KLF that he would place the bomb, but instead fled with his family to his wife's village of Sangrur, approximately two hundred miles away. Singh remained in his wife's village for one month, but then returned to Bhila, staying with his father and his cousins. Singh claims that he was able to avoid being killed because his father paid the KLF money and convinced them that Singh was feeding false information to the police. Singh also claims that his father moved him to Ludihana, another Punjabi town.

In May 1994, Pal Tandra, a KLF leader, was arrested and killed by police in Jalinder, a village approximately thirty-five miles from Bhila. Singh claims that his family was then threatened by the KLF because the KLF blamed Singh for Pal Tandra's death, and Singh's father was told that Singh would be killed. Singh then sent his wife and children to live with his wife's cousin in Ludihana. Singh fled to Delhi, where an agent, hired by his father at a cost of approximately $16,000, helped Singh obtain a visa by posing as his business partner. Singh then flew to the United States, arriving in late July 1994. Singh was admitted into the United States as a nonimmigrant visitor for pleasure, with his authorization to remain in the country set to expire in January 1995.

In September 1998, the Immigration and Naturalization Service ("INS") served Singh with a Notice to Appear, charging him with removal. Singh admitted to the allegations, and the IJ designated India as his country for removal. Singh filed for asylum, withholding of removal, and relief under the Convention Against Torture, and on October 24, 2000, the IJ heard Singh's claims. After hearing Singh testify (through the aid of a Punjabi interpreter), the IJ found Singh's allegations incredible based on various inconsistencies in his testimony and denied relief on all claims. Singh appealed to the BIA, and the BIA affirmed the IJ's decision in a one-page order, apparently adopting the reasoning previously set forth by the IJ. The BIA also noted that Singh was not denied a fair hearing based on the IJ's refusal to let Karen Parker, an expert witness, testify; that Singh could not obtain relief based on a fear of torture because of the IJ's adverse credibility finding; and that additional evidence submitted by Singh could not be considered because Singh did not file a motion

---

[1]Singh claims that he subsequently had surgery on his legs in December 1988, but that the surgery was only partially successful.

to reopen and because the evidence would not alter the outcome of his case.  Singh now petitions this court for review of the denial of his asylum, withholding of removal, and Convention Against Torture claims.

## II.  ANALYSIS

### A.  Standard of Review

Title 8 U.S.C. § 1252 furnishes this court jurisdiction to review the BIA's decision affirming the IJ's denial of asylum, withholding of removal, and relief under the Convention Against Torture. *See Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004); *Ali v. Reno*, 237 F.3d 591, 596 (6th Cir. 2001).  We review administrative findings of fact, such as whether an alien qualifies as a refugee, under the substantial evidence standard, keeping in mind that such findings are "'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Yu*, 364 F.3d at 702 (quoting 8 U.S.C. § 1252(b)(4)(B)); *see also Ali*, 237 F.3d at 596.  Because the BIA adopted the IJ's reasoning with respect to Singh's INA-based claims for asylum and withholding of removal, we review those aspects of the IJ's decision directly.  *See Abay v. Ashcroft*, 368 F.3d 634, 637-38 (6th Cir. 2004).

### B.  Asylum and Withholding of Removal under the INA

Singh first asserts that the IJ erred in denying his claims for asylum and withholding of removal under the INA based on a finding that Singh's testimony lacked credibility.  Because we cannot say that any reasonable adjudicator would be compelled to conclude that Singh's allegations of past persecution were credible and entitled him to refugee status, we deny the petition for review of the IJ's denial of Singh's INA-based claims for asylum and withholding of removal.

#### 1.  Grounds for Obtaining Asylum and Withholding of Removal

The Attorney General, in his or her discretion, may grant asylum to a "refugee;" i.e., "a person who is unable or unwilling to return to his home country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004) (quoting 8 U.S.C. § 1101(a)(42)(A)).  Persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998).  A showing of well-founded fear of future persecution requires a demonstration by the alien:

> (1) that he has a fear of persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) that he is unable or unwilling to return to that country because of such fear.

*Pilica*, 388 F.3d at 950.  Applicants who establish that they have suffered past persecution are presumed to have a well-founded fear of future persecution, but this presumption may be rebutted by the government if it shows by a preponderance of the evidence that conditions in the country have changed so fundamentally that the applicant no longer has a well-founded fear of persecution. *Id.*; *see Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003).

Whereas granting asylum to a refugee is a matter of discretion exercised by the Attorney General, "[w]ithholding of removal is mandatory if an alien establishes that his 'life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Pilica*, 388 F.3d at 951 (quoting 8

C.F.R. § 208.16(b)).  An alien seeking withholding of removal must demonstrate "that there is a clear probability that he will be subject to persecution if forced to return to the country of removal." *Id.*  Because an alien must meet a higher burden in establishing a right to withholding of removal than in demonstrating asylum eligibility, an alien who fails to qualify for asylum necessarily does not qualify for withholding of removal.  *See id.* at 955.

## 2.  Validity of IJ's Adverse Credibility Determination

In the case at bar, the IJ's decision to deny asylum and withholding of removal under the INA rested largely on the IJ's finding that Singh's testimony lacked credibility.  When an IJ determines that an alien's testimony lacks credibility, the IJ must include in his or her decision "specific reasons" explaining why the IJ reached such a conclusion. *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004).  Moreover, the IJ's "adverse credibility finding must be based on issues that go to the heart of the applicant's claim.  They cannot be based on an irrelevant inconsistency.  If discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Id.* (internal quotation marks and citation omitted).  Singh contends that the IJ erred in deeming inconsistent various statements made by Singh in his asylum application and during the administrative hearing, and that, as a result, the IJ's adverse credibility determination cannot stand.  Although this is a close case and several of the grounds upon which the IJ relied are somewhat questionable, we conclude that the evidentiary record does not compel a finding that Singh's testimony was credible with respect to his INA-based claims for asylum and withholding of removal.  *See Pilica*, 388 F.3d at 952 (explaining that an "IJ's adverse credibility findings . . . 'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary'") (quoting 8 U.S.C. § 1252(b)(4)(B)).

The IJ's adverse credibility determination in this case relies primarily on two key inconsistencies in Singh's asylum application and his oral testimony before the IJ.  First, the IJ relied on an apparent inconsistency in Singh's testimony with respect to Singh's involvement in the death of Pal Tandra, a KLF leader.  Specifically, the IJ observed that, in his asylum application, Singh stated that he had given information to the police regarding Pal Tandra's whereabouts and that "'[t]his information led to his capture, arrest, and death at the hands of the police.'"  Joint Appendix ("J.A.") at 46 (IJ Decision at 10) (quoting Statement of P. Singh at 6).  When first asked about Pal Tandra's death at the hearing, however, Singh stated that he was "not at all" involved.  J.A. at 202 (Hr'g Tr. at 159).  Although Singh's statement that he was "not at all" involved arguably could have been interpreted to mean only that Singh did not participate in the actual police action in which Pal Tandra was killed, the IJ's understanding of Singh's testimony to be that he did not participate more generally in Pal Tandra's death does not seem unreasonable, and thus supports the IJ's adverse credibility finding.

The second major inconsistency undergirding the IJ's adverse credibility finding pertains to Singh's involvement in the KLF's plan to bomb the Senior Police Detective in Punjab.  In his asylum application, Singh stated that he was instructed by the KLF to place a bomb "on the home of the Superintendent of Police, Shoab Kumar, the Senior Police Detective." J.A. at 454 (Statement of P. Singh at 5).  During the hearing, however, Singh indicated that he was supposed to place the bomb in the officer's room at the police station. J.A. at 186 (Hr'g Tr. at 143) ("Q. Where were you told to plant that bomb?  A. When they take me to police station, you can put it there.  Q. So they wanted you to put it in the police station, correct?  A. Yes, in the officer.  Q. I beg your pardon?  A. Yes, in the officer's room.  Q. At the police station?  A. Yes.").  Although Singh attempted to reconcile these apparently inconsistent statements regarding the placement of the bomb by

explaining that the targeted police official lived next door to the police station,[2] the IJ found such an explanation to be lacking. Because the IJ was not unreasonable in finding that Singh failed to explain adequately the apparent inconsistencies in his testimony regarding an event central to his claim of past persecution, we cannot say that, based on the record before us, any reasonable adjudicator would be required to find Singh credible.

Although we conclude that the two aforementioned inconsistencies in Singh's testimony furnish the substantial evidence necessary to sustain the IJ's adverse credibility determination with respect to Singh's claims for asylum and withholding of removal under the INA, we also note that many of the other grounds cited by the IJ are quite weak and do little to bolster the IJ's adverse credibility determination. First, the IJ found that Singh failed to explain why his father, the largest landowner in Bhila, was unable to secure passage for Singh's wife and children to come to the United States. J.A. at 47 (IJ Decision at 11). This justification for deeming Singh incredible is unsupported by the record, however, because Singh explained that his father had to pay in excess of $16,000 to facilitate Singh's emigration from India and that his family had to borrow money and sell some of their possessions in order to raise these funds. The record contains no information regarding the market value of Singh's father's dairy farm and other land holdings, and it is unclear what an agent might charge to make immigration arrangements for an entire family. Thus, the IJ's reliance on Singh's supposed failure to explain adequately why his family did not join him in the United States seems misplaced.

Second, the IJ also included as a "minor" inconsistency supporting her adverse credibility determination the fact that Singh testified that he was able to read English but was unable to respond adequately to questions regarding the contents of an affidavit by the current sarpanch of Bhila, which was written in English. A review of the hearing transcript reveals, however, that Singh was asked only whether he can "read a little English," and Singh's reliance on the use of a Punjabi translator throughout the course of the hearing provides some indication that his English-language skills may be rather limited. J.A. at 156 (Hr'g Tr. at 102). Moreover, while the IJ stated that Singh appeared to read the affidavit, the hearing transcript does not indicate that Singh was given an opportunity to review the document before being bombarded by questions from the Government's counsel. Ultimately, we fail to see how Singh's proficiency in reading English relates to the credibility of his allegations of past persecution, and thus this "minor" inconsistency furnishes no ground for deeming Singh incredible.

Third, the IJ asserted that the sarpanch's affidavit revealed a "very significant inconsistency" in that Singh was unable to explain why the affidavit indicated that no criminal case had ever been lodged against Singh, yet Singh claimed to have police reports showing that he had in fact been arrested. J.A. at 48 (IJ Decision at 12). The IJ's reliance on these police reports to impeach Singh's credibility is questionable, however, given that the IJ deemed the police reports inadmissible because they had not been properly authenticated pursuant to 8 C.F.R. § 287.6. J.A. at 161 (Hr'g Tr. at 107) (stating in reference to police reports that, "technically, the regulations . . . say they can't be used for any purpose"). Moreover, the statement in the sarpanch's affidavit that "[t]here is nothing adverse against [Singh] in the police or no criminal case has ever been registered against him in India" may be correct, notwithstanding the purported existence of police reports to the contrary, because it appears that Indian police have not maintained accurate arrest records when investigating Sikh separatists. J.A. at 308 (Sarpanch Affidavit); *see* J.A. at 375 (U.S. Dep't of State, India Country Report on Human Rights Practices for 1998) ("There are credible reports that police

---

[2] J.A. at 187 (Hr'g Tr. at 144) ("Because that's police station. He live next door — . . . There is a room near the police station where he used to see me."); J.A. at 189 (Hr'g Tr. at 146) ("Q. In the officer's room? A. The place he used to see me when you entered the police station, he has a special room. He used to see me — he used to call me over there. Q. Was that his home? A. His house was right next to it. They have the residence right next to the police station.").

throughout the country often do not file required arrest reports.  As a result, there are hundreds of unsolved disappearances in which relatives claim that an individual was taken into police custody and never heard from again.  Police usually deny these claims, countering that there are no records of arrest.").  Thus, we conclude that the asserted inconsistencies in the sarpanch's affidavit and the unauthenticated police records do not support the IJ's adverse credibility finding.

In sum, the IJ's decision finding that Singh lacked credibility does rely on a number of questionable assumptions and conclusions, rendering this a very close case.  We affirm the IJ's decision to deny Singh asylum and withholding of removal under the INA, however, because we may reverse the IJ's adverse credibility finding only if any reasonable adjudicator would be compelled to do so, and the IJ was not unreasonable in finding Singh's testimony to be inconsistent with respect to his involvement in the death of Pal Tandra and the planned bombing of a police official.  *See Sylla*, 388 F.3d at 925 (explaining that the substantial evidence standard used in reviewing credibility determinations "is a deferential standard: A reviewing court should not reverse simply because it is convinced that it would have decided the case differently") (internal quotation marks and citation omitted).

## C.  Relief under the Convention Against Torture[3]

In addition to his claims for asylum and withholding of removal under the INA, Singh also petitions for review of the denial of his claim for withholding of removal based on the Convention Against Torture.  In order to establish entitlement to such relief, an alien must prove "'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'"  *Pilica*, 388 F.3d at 951 (quoting 8 C.F.R. § 208.16(c)(2)).

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).  "In assessing the risk of torture, the adjudicator must consider the possibility of future torture, including any evidence of past torture inflicted upon the applicant and evidence that the applicant is not likely to be tortured in another area of the country of removal."  *Ali*, 237 F.3d at 596-97.

Although the IJ denied Singh relief under the Convention Against Torture, the IJ did not include in her decision a finding as to whether Singh's testimony that he had been tortured was credible or not, but rather simply made a generalized adverse credibility finding.  J.A. at 50 (IJ Decision at 14) (rendering no specific credibility finding regarding torture allegations, concluding only that, "Respondent is incredible on the very events which underlie his claim.  His documents are unreliable, and his *claim of persecution* in the past by the KLF, by the police, all *because of imputed political opinion* fail.") (emphases added).  The BIA, in reviewing the IJ's decision, similarly failed to make a specific credibility finding with respect to Singh's testimony that he was tortured, merely reiterating that, "in light of the Immigration Judge's adverse credibility

---

[3] As a technical matter, the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, 23 I.L.M. 1027, is not self-executing, but rather has been implemented in the United States via the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681, and regulations promulgated thereunder.  *See Ali*, 237 F.3d at 596.

determination, we find that the respondent did not demonstrate by sufficiently consistent and credible testimony that it is more likely than not that he would suffer torture if returned to India." J.A. at 4 (BIA Order). Because neither the IJ nor the BIA made a specific finding as to whether Singh's testimony that he was tortured was credible, we vacate the BIA's decision with respect to Singh's Convention Against Torture claim and remand for further consideration of this claim.

A review of the reasons proffered by the IJ in support of her adverse credibility finding reveals the error in conflating Singh's Convention Against Torture claim with his claims for asylum and withholding of removal based on his status as a refugee. The two major inconsistencies cited by the IJ in support of her adverse credibility determination with respect to Singh's INA-based asylum and withholding of removal claims (i.e., Singh's involvement in the death of Pal Tandra and the planned location of the KLF's bomb) do not pertain to Singh's allegations that he was tortured by the police, but rather to his allegations that he had been persecuted on account of political opinions imputed to him by the police and the KLF. Thus, the IJ's decision does not address the central issue presented by Singh's Convention Against Torture claim: whether, based on past incidents of torture, it is more likely than not that Singh will be tortured if he returns to India. *See Castellano-Chacon v. INS*, 341 F.3d 533, 551-52 (6th Cir. 2003) (explaining that an application for withholding of removal under the INA differs from one filed under the Convention Against Torture in that the latter "focuses on the particularized threat of torture" without requiring a linkage to race, religion, nationality, membership in a particular social group, or political opinion, and thus an alien may succeed on a Convention Against Torture claim even if his or her INA-based claim for withholding of removal is denied).

The only portion of the IJ's decision that could be construed as addressing Singh's Convention Against Torture claim is the IJ's discussion of whether Singh's medical records corroborated his testimony that he had been tortured by the police. The IJ focused in particular on Singh's medical records from 1996 and concluded that these documents were "unreliable" because:

> [i]n the medical history, there is no mention of what caused this condition [i.e., "venous insufficiency of both lower extremities with right lower extremity superficial phlebitis and chronic statis, dermatitis of both lower extremities"], e.g., torture, or activities of respondent, or family history. Such omission in a medical report is implausible, and despite respondent's testimony that this condition was tied to police torture that he suffered in India, the Court notes that such condition could have just as easily been the result of his wrestling career.

J.A. at 49 (IJ Decision at 13) (quoting J.A. at 320 (April 1996 Emergency Room Report)). Denying Singh's Convention Against Torture claim on this basis alone, however, is problematic for two reasons.

First, the finding appears incorrect as a factual matter because medical records submitted to the IJ specifically document the fact that Singh told his doctors that his injuries were caused by police torture. The handwritten chart accompanying the 1996 emergency room report quoted by the IJ in her decision indicates that Singh informed the emergency room physician that he had sustained leg injuries as a result of being beaten while in India. J.A. at 321 ("States 2 or 3 yrs ago was beat up in India - Suffered [] lower extrem. injuries . . . lower extremity pain and problems since . . . States unable to walk for 1 mo. after 'beating' incident"). In addition, medical records documenting Singh's treatment while in India also note that Singh had told his doctor that he had sustained his leg injuries when he was tortured by the police. J.A. at 357 (Letter from Dr. T. N. Shadangi of Ludihana, India) ("This is to certify that Patient Paramdeep Singh son of S. Ranjit Singh, resident of Village BILAH, Distt. Ludihana, Punjab had been admitted with drop foot left side alleged to be due to Police torture. His left posterior TIBIAL nerve was compressed and partially cut. He was

put on conservative treatment w.e.f. 18 April, 1988 to 15 May 1988. Paul Bunner sutures were applied at the cut portion of the nerve (Post. Tibial).").

Moreover, the IJ's finding regarding the reliability of Singh's medical records does not dispose of Singh's Convention Against Torture claim because an alien's allegations of torture are not automatically incredible simply for failure to produce corroborating documentary evidence. *See* 8 C.F.R. § 208.16(c)(2) (providing with respect to claims for withholding of removal pursuant to the Convention Against Torture that "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration"). Although the IJ found Singh's medical records to be "unreliable," the IJ did not make a credibility finding with respect to Singh's own testimony that he was tortured by the police. J.A. at 49 (IJ Decision at 13). Thus, we must remand Singh's Convention Against Torture claim for further factfinding.

## D. Exclusion of Expert Witness Testimony

Singh finally asserts that the IJ erred in refusing to permit an expert witness, Karen Parker, to testify. Because we do not believe that the IJ's exclusion of Parker's testimony amounted to a violation of Singh's right to due process, we deny relief on this ground.

In immigration proceedings, an applicant is "entitled to 'a reasonable opportunity to examine the evidence against him, to present evidence on his own behalf, and to cross-examine witnesses presented by the Government.'" *Mikhailevitch*, 146 F.3d at 391 (quoting 8 U.S.C. § 1252(b)(3)). Evidentiary matters in immigration proceedings, however, are not subject to the Federal Rules of Evidence, *Dallo v. INS*, 765 F.2d 581, 586 (6th Cir. 1985), and we review evidentiary rulings by IJs only to determine whether such rulings have resulted in a violation of due process. *See Castellano-Chacon*, 341 F.3d at 552-53; *Mikhailevitch*, 146 F.3d at 391 ("Such opportunity need not be upon a regular, set occasion, and according to the forms of judicial procedure, but one that will secure the prompt, vigorous action contemplated by Congress, and at the same time be appropriate to the nature of the case upon which such officers are required to act.") (internal quotation marks and citations omitted).

Based on the record before us, it appears that the IJ based her decision to exclude the expert witness's testimony on the fact that Singh's counsel failed to obtain, in advance of the removal hearing, an order from the IJ permitting the admission of expert testimony. Singh has failed to demonstrate how a requirement that a party obtain an IJ's advance permission to present expert witness testimony during a removal proceeding effects a violation of due process, and thus we decline to grant Singh relief on this ground.

## III. CONCLUSION

Because the record before us would not compel any reasonable adjudicator to deem credible Singh's allegations of past persecution based on imputed political opinion, we **DENY** the petition for review of the BIA's decision insofar as it denies Singh's claims for asylum and withholding of removal under the INA. With respect to Singh's Convention Against Torture claim, however, we **VACATE** the BIA's decision and **REMAND** for further proceedings to determine whether it is more likely than not that Singh will be tortured if he is removed to India.