NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0859n.06
Filed: October 19, 2005

## No. 04-3303

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| RAED MANUEL ELIAS ABBO, | ) |
| | ) |
|     Petitioner, | )  On Petition For Review |
| | )  Of An Order Of The |
| v. | )  Board Of Immigration |
| | )  Appeals |
| ALBERTO R. GONZALES, Attorney General, | ) |
| | ) |
|     Respondent, | ) |

**Before:**      **BOGGS, Chief Judge; and NORRIS and COOK, Circuit Judges.**

**PER CURIAM.** Petitioner-Appellant Raed Manuel Elias Abbo, a citizen of Iraq, petitioners for review a final decision by the Board of Immigration Appeals ("BIA") affirming an immigration judge's ("IJ") denial of his applications for asylum, withholding of removal, and torture convention relief. The IJ determined that Abbo lacked credibility due to inconsistencies in his testimony, that he had failed to prove past persecution, and that the application was frivolous. The BIA reversed the IJ's finding of frivolity but affirmed the judgment regarding lack of credibility and failure to demonstrate past persecution. In addition, the BIA took official notice that Iraq had undergone a fundamental change of circumstances since Abbo's entry into the United States in 2001 and that Abbo had failed to demonstrate a well-founded fear of persecution from a new source. Abbo now contends that (1) the IJ's negative credibility finding was erroneous because the cited

inconsistences were minor in character, (2) the IJ's determination that the petitioner had failed to satisfy his burden of proof with regard to past persecution and a well-founded fear of future persecution constitutes reversible error, and (3) the BIA violated due process by failing to afford the petitioner the opportunity to present evidence to refute its changed country conditions finding. We reverse the IJ and BIA as to the adverse credibility finding and the finding that petitioner failed to prove past persecution. We do not reach the question of petitioner's fear of future persecution or his due process challenge.

## I

Petitioner Abbo claims to be an Iraqi citizen, a former resident of Baghdad, and a member of that country's Christian Chaldean religious minority. His command of the Chaldean language is marginal, however, having spoke Arabic throughout his life. Abbo testified that he was born in the notably Chaldean northern village of Telkaif, served in Iraq's military from 1994 until 1996, and subsequently drove a taxi in Baghdad. During his military service, Abbo claimed at his hearing that he was ordered to prepare food and wash clothing "like a servant" for the officers because of his Christian faith. He refused, according to his oral testimony, "because to me, that was the something humiliating," for which reason "every day, [he] was beat[en], [and] tortured" for "one week till 10 days." He declared in his credible fear interview (on January 31, 2001) that "in the military the officers used the Chaldeans as slaves" but he did not mention in that interview that he had been imprisoned or tortured. He also did not make any mention of torture and denied having been imprisoned during his sworn statement upon entry into the United States on January 12, 2001. His

asylum application of December 11, 2001 also did not include the fact that he had been imprisoned, though it did note that "[m]yself and a number of my family and friends, who share the same religion, have been threatened and persecuted and tortured by the Iraqi authorities on reason of our faith." When challenged for these apparent inconsistencies, Abbo averred confusion and translation errors, claiming he had requested an Arabic interpreter but had been provided with a Chaldean language interpreter instead.

In 1999, according to Abbo, he was required to return to the military for a two-month refresher course. In late September or early October 2000, Abbo claims that he was approached by members of Iraq's "*Fedayeen Saddam*" (Saddam's Men of Sacrifice) which he called, alternatively, Saddam's Commandos, "a man for Saddam," "Fedahee," and "Faddyou . . . Saddam." The *Fedayeen Saddam* came three times to his house to recruit him for a war on Israel. Abbo claimed at his hearing that, on the second trip, several days after the first, they beat him and threatened his family if he did not join. Abbo did not note during his interview upon entering the United States that they had beaten him, stating only that "[t]hey looked for me several times. So I fled." On his credible fear report, Abbo was reported to have said that on the third approach of the *Fedayeen Saddam*, in early October 2000, he "saw them and he ran away from the house." At his hearing, Abbo averred instead that he had "felt that they were going to come" and therefore he fled the house "before they came." When pressed as to the apparent contradiction, Abbo complained that the credible fear interview report was incorrect.

Abbo claimed that, while hiding at a friend's house in Baghdad, he called a relative to inquire as to his family's safety. He claims, in his oral testimony, that he spoke with his aunt Kamela who informed him that his father had been hospitalized and partially paralyzed due to a severe beating he had received at the hands of the *Fedayeen Saddam* thugs who had arrived after midnight looking for Abbo. Petitioner's asylum interview contains much the same testimony, excepting only the identity of the relative to whom he had spoken on the telephone. His interview upon entry into the United States notes only that "[t]hey looked for me several times. So I fled. . . . They will kill me for refusing to join the Baath Party." His credible fear interview does not mention his father's beating but instead states that "[h]is father was arrested for ten days. While incarcerated he suffered a heart attack and was released. When [his] father was released the family told [Abbo] not to return because he would be executed." Abbo's cousin Souad Hanna Zasmar testified at his hearing that only she and her brother spoke to Abbo that night and that her mother Kamela was ill and sleeping when Abbo called. Zasmar corroborated Abbo's testimony at the hearing that members of the *Fedayeen Saddam* had come to Abbo's house in the middle of the night looking for him and had beaten Abbo's father when they could not find Abbo.

Testifying that he was fearful of prison and torture should he be caught, Abbo fled to Jordan approximately ten days after his father's beating. He said his family told him to leave. He obtained a passport from a smuggler in Amman, Jordan, and fled thence to Guatemala in the company of an alien smuggler. The smuggler took his passport in Guatemala and left. Another smuggler took Abbo to Mexico without any documentation. Thence, Abbo entered the United States at San Ysidro,

No. 04-3303

Abbo v. Gonzales

California, on January 12, 2001. Abbo applied for admission upon arrival in the United States and made a sworn statement regarding his fear to an immigration inspector with the assistance of an Arabic translator. He was subsequently detained in a prison for a few weeks. On January 31, 2001, Abbo conducted a credible fear interview with an asylum officer with the assistance of a Chaldean interpreter and he was thereafter paroled into the United States. Abbo moved to change venue to Detroit on March 14, 2001 and this motion was granted by an IJ in San Diego on March 26, 2001. Abbo filed an asylum application with the immigration court on December 11, 2001. A merits hearing was held on November 1, 2002. The IJ ruled that Abbo's application was frivolous, that the inconsistencies rendered his testimony incredible, and that therefore he had failed to produce sufficient evidence to prove that he had suffered past persecution or had a well-founded fear of future persecution.

Abbo appealed to the BIA. On February 9, 2004, the BIA denied Abbo's request for oral argument and summarily affirmed the IJ's findings as to Abbo's lack of credibility and his failure to meet his burden of proof, although it reversed the IJ's finding that Abbo had filed a frivolous asylum claim because the discrepancies cited were "insufficient, alone, to serve as a basis to conclude that the claim was fabricated." The BIA also found that "even considering all of [Abbo's] testimony as credible, since the date of [his] hearing, conditions in Iraq have changed substantially." The BIA cited two newspaper articles from 2003 and took administrative notice that the United States and its allies had deposed Saddam Hussein and was "currently attempting to establish an interim replacement government." The BIA therefore held that due to the removal of the

government that had allegedly persecuted him, Abbo no longer had a "reasonable basis for a well-founded fear of persecution should he return to Iraq," noting that "where an alien has shown that he or she has been persecuted in the past . . . and the record reflects that country conditions have changed to such an extent that the asylum applicant no longer has a well-founded fear of persecution from the original persecutors, the applicant bears the burden of demonstrating that he or she has a well-founded fear of persecution from any new source." The BIA concluded that the fact that he had failed to demonstrate a well-founded fear of persecution from a source other than Hussein's tyrannical regime provided yet another ground for dismissing Abbo's petition.

One day before his oral argument before this court, Abbo filed a motion to reopen with the BIA.

**II**

8 U.S.C. § 1252(a)(1) gives this court jurisdiction to review the BIA's final order of removal. The IJ's credibility determinations are findings of fact that are reviewed "for substantial evidence, reversing only if any reasonable adjudicator would be compelled to conclude to the contrary." *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004). *See* 8 U.S.C. § 1252(b)(4)(B) ("the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). The substantial evidence standard is thus highly deferential. The Sixth Circuit cannot reverse the Board's determination simply because the court would have decided the issue differently on a *de novo* review. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). "While

No. 04-3303

Abbo v. Gonzales

an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons." *Id.* at 926.

Resolution of a request for asylum is a two-step inquiry: (1) whether the alien qualifies as a refugee, and (2) whether the alien merits a favorable exercise of discretion by the Attorney General. 8 U.S.C. § 1158(b)(1); *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004). The alien has the burden of proof at both stages. *Ibid.* A refugee is any person who is outside of the country of such person's nationality who is unable or unwilling to return to that country due to past persecution and who possesses a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42); *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005). A well-founded fear must be both subjectively genuine and objectively reasonable. *Abay v. Ashcroft*, 368 F.3d 634, 637 (6th Cir. 2004). The alien who satisfies the burden of establishing past persecution is presumed to have a well-founded fear of future persecution, though the government may rebut that presumption by showing by a preponderance of the evidence that conditions in the alien's country have changed to such an extent that the alien no longer has a well-founded fear of being persecuted upon return. *Singh v. Ashcroft*, 398 F.3d at 401.

An alien is not *required* to produce corroborating evidence of persecution, as the alien's own testimony can be sufficient when it is believable, credible, and sufficiently detailed. *Pilica v. Ashcroft*, 388 F.3d at 954. "Credibility determinations are findings of fact, falling within the first step of determining whether the alien qualifies as a refugee" and the IJ's determination will be

upheld when there are major inconsistencies going to the heart of the applicant's asylum claim. *Yu v. Ashcroft*, 364 F.3d at 703. If the discrepancies in the alien's evidence cannot be viewed as attempts by the alien to enhance his claims of persecution, the discrepancies have no bearing on the credibility. Minor and irrelevant inconsistencies cannot constitute the basis for an adverse credibility determination. *Sylla v. INS*, 388 F.3d at 926. However, the "cumulative effect" of minor inconsistencies may lend support to other grounds for an adverse credibility determination. *Yu v. Ashcroft*, 364 F.3d at 704.

In this case, the IJ noted some discrepancies among the four sources of Abbo's testimony – his sworn statement upon entry into the United States of January 12, 2001, his credible fear interview of January 31, 2001, his asylum application of December 11, 2001, and his oral testimony of November 1, 2002 – and determined that these discrepancies required him to issue an adverse credibility finding. The major inconsistencies that the IJ found included (1) whether Abbo had been incarcerated by the Iraqi regime, (2) whether Abbo had been tortured by the Iraqi regime, (3) whether the *Fedayeen Saddam* approached Abbo in 1999 or 2000, (4) whether Abbo was at home at the time of the *Fedayeen Saddam*'s third approach, (5) whether Abbo had called his aunt, (6) whether Abbo's father had suffered a beating and a heart attack or stroke at the hands of the *Fedayeen Saddam*, (7) whether Abbo was Chaldean, and (8) whether Abbo was so fearful of the United States immigration officers as to excuse his failure to inform them of his incarcerations by the Iraqi military. As explained below, we hold that the IJ's determinations fail even under the

highly deferential substantial evidence standard of review because the inconsistencies cited were either *de minimis* in scope or chimerical in nature.

During his January 12, 2001 interview, Abbo explicitly denied having ever been convicted of a crime or incarcerated. During his credible fear interview of January 31, Abbo never mentioned that he had been incarcerated in Iraq, stating instead that the "officers used the Chaldeans as slaves and because he refused he was transferred to the infantry." In his asylum application of December 11, Abbo noted that he had been "persecuted and harrassed [sic]," "threatened," "beaten," and "tortured," but he never stated that he had been incarcerated. During his oral hearing, however, Abbo testified that he had been imprisoned by the Iraqi military for up to ten days for having refused to perform certain tasks required of him. Abbo attempted to reconcile the apparent discrepancy by explaining that he thought that the interviewer had meant to ask about incarcerations when he was not in the military, and his attorney added that he believed the question had referred exclusively to arrests for criminal matters. On appeal, Abbo notes that the IJ's reliance on the initial application is "incredibly unfair" because of the difficult and hurried circumstances in which they are filed. This court has recently cited with approval the Second Circuit's determination that the circumstances of an asylum application "do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding, and . . . holding applicants to such a standard is not only unrealistic but also unfair." *Liti v. Gonzales*, 411 F.3d 631, 638 (6th Cir. 2005) (quoting *Secaida-Rosales v. INS*, 331 F.3d 297 (2d Cir. 2003)). As such, the inconsistency in Abbo's testimony regarding his incarceration is more apparent than real and is sufficiently technical

and minor in nature that this court holds that the IJ's finding fails under the deferential substantial evidence standard of review.

The IJ also placed great weight on the question whether Abbo had consistently testified as to his allegation of torture at the hands of the Iraqi government. In his sworn statement of January 12, Abbo did not specifically aver that he had suffered torture. However, he did state that he had fled Iraq because "I was being persecuted . . . . They were going to kill me." It was not until he filed his asylum application on December 11 that Abbo finally stated explicitly that he had suffered torture, claiming that "[m]yself and a number of my family and friends, who share the same religion, have been threatened and persecuted and tortured by the Iraqi authorities on reason of our faith. I have been harrassed [sic] on several occasions by the Iraqi army and authorities and was beaten." During his hearing on November 1, 2002, Abbo specifically alleged that he had been tortured while incarcerated for up to ten days while in the military for having refused to perform certain tasks. There is no inherent discrepancy among petitioner's accounts. First, he proclaimed upon his entry into the United States that he had been "persecuted," which is to say that he was oppressed, harassed with ill-treatment, or caused to suffer; "persecution" is a word that encompasses the concept of torture. Furthermore, he clearly stated that elements of the regime intended to kill him. In his asylum application, Abbo stated that he had been beaten and harassed, employing synonyms for torture. In fact, the only account in which he failed to allege torture or something analogous to torture was his credible fear interview. But that interview was conducted in Chaldean, a tongue with which he was not fluent, and in conjunction with the fact that it is the lone outlier among his

accounts, we do not find any discrepancies between that interview and his other accounts to be dispositive. We are therefore compelled to find that the IJ relied on a discrepancy that was too minor in scope to undermine petitioner's central claims.

It is uncontroverted that Abbo consistently claimed that he had fled Iraq because the Iraqi "reserve," the "Ba-ath Party," a "military group" composed of "volunteers," or the *Fedayeen Saddam*, had demanded that he join them to fight Israel. None of his three written statements state precisely when or how he was approached by this group's press gang. In his oral testimony on November 1, 2002, Abbo stated on direct examination that he had been required to serve in Iraq's military for two months in 1999 in order to attend a military refresher course. In this testimony, however, he is recorded as saying that "[t]owards the end of 1999, two or three times, Saddam's people would come down to my home. And they said that you have to become one of Saddam's [*Fedayeen*]." On cross examination, however, the chronology became somewhat confused. Abbo was asked when he had completed his refresher course and responded that he had done so in 1999. Then he was asked when he was first approached by someone trying to force him back into military service, to which he responded that they had come for him sometime around the autumn of 2000. The IJ found that the apparent discrepancy between Abbo's testimony on direct and cross-examination rendered his central testimony incredible. Yet it is clear to this court that there was no real discrepancy in Abbo's testimony, for it is transparent that he misstated or mistook the date while describing his military refresher course (in 1999) and his introduction to the Iraqi press gang (in 2000).

In his application of January 12, Abbo did not specify precisely when and how the *Fedayeen Saddam* had approached him, other than noting that "[t]hey looked for me several times." In his credible fear interview of January 31, Abbo appears to have said that the Ba'ath Party had come to his house three times, but when they came the third time "applicant saw them and he ran away from the house." In his asylum application of December 11, Abbo stated only that "[w]hen I realized I had no other options, I decided to leave Iraq." During his oral testimony, Abbo stated that "[t]hey did come 1:00 in the morning, but I had left early that evening." Furthermore, "I felt that they were going to come and before they came, in the evening, in the afternoon, I left the house." The IJ stated in his conclusions that the discrepancy between Abbo's credible fear interview, his oral testimony, and his asylum application raised a "red flag with respect to respondent's credibility." But the apparent discrepancy is reasonably resolved by setting aside the precise language reported by the interviewer in the credible fear interview (wherein Abbo was said to have reported that he saw the militia approach) which was taken in Chaldean rather than in his native Arabic. Other than that particular discrepancy, Abbo's accounts are consistent as to the approach and actions of the press gang, and his flight therefrom. We are compelled to find the IJ was incorrect because the substantive elements of petitioner's descriptions of the *Fedayeen Saddam*'s third approach are otherwise not inconsistent.

The IJ found it important that Abbo's testimony to the effect that he had spoken with his aunt Kamila on the phone after the press gang's third visit to his home was flatly contradicted by the testimony of his lone corroborating witness, his cousin Souad Zasmar. During his oral testimony,

Abbo was asked to whom he had spoken after he had fled his home. He responded "I believe it was my aunt." Abbo then responded affirmatively when asked "she [his aunt Kamila] was the only person you talked to, is that correct?" This testimony was belied by Zasmar, who stated that she had answered Abbo's call and that she and her brother had spoken to Abbo. The IJ stated that this discrepancy "completely torpedoed respondent's credibility." While there is a clear discrepancy between Abbo's and Zasmar's accounts as to which female relative Abbo had spoken, that discrepancy is merely *de minimis* in scale. In addition, the inconsistency does not itself touch on Abbo's central claim that he had fled the Iraqi press gang and decided to flee the country soon thereafter. The question whether Abbo had also spoken with his male cousin is equally minor in nature. Therefore this court is compelled to find the IJ was incorrect in relying on this discrepancy.

The IJ noted that Abbo's testimony was apparently inconsistent regarding the status of his father. According to Abbo's credible fear worksheet of January 31, he said that his father had been arrested after he fled from the Iraqi press gang and that his father suffered a heart attack ten days later and was subsequently released. In his oral testimony of November 1, 2002, however, he stated that his father had been hospitalized for ten days. Abbo challenged the veracity of this particular phrase from his credible fear worksheet, explaining that the interview had been conducted in Chaldean but he was more fluent in Arabic. Abbo's cousin Zasmar corroborated his testimony that the press gang had beaten his father. Because the purported error in translation is not central to Abbo's claim, for it is immaterial to his claim of having fled the *Fedayeen Saddam* whether members of that group arrested his father and he subsequently suffered a heart attack or whether

they beat him until he suffered from a stroke after which he was hospitalized, this court is compelled to find that the IJ reached the wrong conclusion.

The IJ found it incredible that Abbo claimed to be Chaldean but lacked fluency in that tongue. Yet it is obviously no more necessary for a Chaldean to speak the Chaldean tongue fluently than it is necessary to be ethnically or religiously Chaldean in order to be fluent in that language. In light of the grim legal circumstances of Iraqi Chaldeans under Hussein's tyrannical regime, in tandem with the fact that people in Baghdad mostly speak Arabic, it is not surprising that Abbo cannot claim fluency in his people's native tongue. This is reinforced by his testimony that his church even offered rites in Arabic. Abbo also did not provide any material evidence to corroborate his claim to be Chaldean. He claimed to have possessed a baptismal certificate, but when the IJ requested it, Abbo proved unable to locate it.[1] However, Abbo's assertion that he was Chaldean was corroborated by his cousin Zasmar's testimony to that effect. Because of this corroboration, Abbo's claim to be Chaldean is sufficiently persuasive as to compel a reasonable adjudicator that the IJ erred in finding it incredible.

Finally, the IJ found it incredible that Abbo maintained at his hearing that he was afraid of immigration officials and yet he felt unafraid upon arriving in the United States where he expected to find safety and security. This issue is pertinent because Abbo claims that his statements during his credible fear interview on January 31 were incomplete in that he had failed to inform the

---

[1]During his oral argument before this court, petitioner's attorney claimed that the baptismal certificate had been located and was available for judicial review. This court did not examine the evidence but notes that it should be available for review on remand.

Chaldean language interviewer that he was not fluent in that tongue. Abbo testified that "I was scared until I was released from prison and then I felt safeness [sic] and more relaxed." The United States's liberty continues to attract oppressed people to come to its shores, but that does not deny the fact that many of those same immigrants are intimidated and fearful when incarcerated and interrogated by immigration officials. We cannot find that Abbo's mixed feelings upon entering this country and interacting with immigration officials point to any material discrepancy. For this reason, we cannot discount that fear caused him to remain silent about his difficulties with the Chaldean tongue.

Therefore this court is compelled to find that each of the above inconsistencies were insufficient to support the IJ's adverse credibility determination. In the absence of any basis for that determination, this court reverses the IJ's finding on petitioner's credibility.

### III

As with other findings of fact, this court reviews the IJ's determination that the alien failed to prove past persecution and a well-founded fear of future persecution under the substantial evidence standard. *Yu v. Ashcroft*, 364 F.3d at 703. A well-founded fear of future persecution must be both subjectively genuine and objectively reasonable. *Abay v. Ashcroft*, 368 F.3d at 637. The alien who satisfies the burden of establishing past persecution is presumed to have a well-founded fear of future persecution, though immigration officials may rebut that presumption by showing by a preponderance of the evidence that conditions in the alien's country have changed to such an extent that the alien no longer has a well-founded fear of being persecuted upon return. *Singh v.*

*Ashcroft*, 398 F.3d at 401. An alien is not required to produce corroborating evidence of persecution, for the alien's own testimony can be sufficient where believable, credible, and sufficiently detailed. *Pilica v. Ashcroft*, 388 F.3d at 954.

Here, the IJ and BIA found that the petitioner lacked credibility in his testimony. In the absence of credible testimony, there was insufficient evidence to meet Abbo's burden of proving past persecution or a well-founded fear of future persecution. The IJ noted that the general circumstances of Abbo's flight from Iraq, if believed, would be sufficient for asylum. "[I]f everything respondent said, that is on a base [sic] of leaving to escape being drafted into this commando organization as delineated above, the Court would grant him his application for asylum." Because the panel reverses the IJ's adverse credibility finding, it also reverses the IJ's determination that petitioner failed to establish past persecution.

**IV**

The alien who satisfies the burden of establishing past persecution is presumed to have a well-founded fear of future persecution, though immigration officials may rebut that presumption by showing by a preponderance of the evidence that conditions in the alien's country have changed to such an extent that the alien no longer has a well-founded fear of being persecuted upon return. *Singh v. Ashcroft*, 398 F.3d at 401. Immigration officials must do more than show that circumstances have changed; they must show that the change negates the particular alien's well-founded fear of persecution. *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003). A court of appeals cannot directly evaluate such a fact-bound question as to a country's political situation, but must

remand the case to the BIA. *INS v. Ventura*, 537 U.S. 12, 16-18 (2002) (conditions in foreign country are within special expertise of BIA).

In the instant case, the BIA attempted to moot the thrust of Abbo's appeal by finding that country conditions in Iraq had changed since 2001 so as to allow Abbo to return without fear of future persecution. The BIA sought to accomplish this by taking administrative notice of two newspaper accounts and concluding thereby that the "United States and a coalition of forces from other nations have deposed Saddam Hussein and are currently attempting to establish an interim replacement government." Abbo complains that the BIA abused its discretion by using documents not in the record to support a determination of changed country conditions and by finding changed country conditions despite not having conducted an individualized well-founded fear analysis, and also violated his constitutional due process rights by denying him any opportunity to rebut its determination.

Petitioner filed a motion to reopen with the BIA on the day immediately prior to his oral argument before this court. Therefore petitioner's factual challenge to the BIA's changed country conditions determination is not properly before this court. To the extent that petitioner has not exhausted "his administrative remedies with respect to certain claims, this court does not have jurisdiction to address those claims." *Ramani v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004). "If the BIA were to deny the motion, petitioners could then challenge the BIA's decision in this Court as violative of due process. This procedure will allow the BIA to compile a record which is

adequate for judicial review." *Dokic v. INS*, 899 F.2d 530, 532 (6th Cir. 1990) (internal citation omitted).

Moreover, Abbo's due process claim is not ripe for our adjudication. Ripeness is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction" and "the question of ripeness may be considered on a court's own motion." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003) (internal quotations and citation omitted) (denying for lack of ripeness trade association's challenge to agency regulation). "Determining whether administrative action is ripe for judicial review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding our consideration." *Ibid.* Petitioner's due process challenge is not ripe because it may be rendered unnecessary if the BIA accepts petitioner's motion to reopen. In addition, neither party would suffer a cognizable injury by a delay in this court's adjudication of the due process issue. Therefore this court dismisses without prejudice petitioner's factual and constitutional challenges to the BIA's administrative notice regarding changed country conditions in Iraq.

## V

Accordingly, we **REVERSE** the IJ's adverse credibility finding, **REVERSE** the IJ's finding that petitioner had failed to meet his burden regarding past persecution, and **DISMISS WITHOUT PREJUDICE** petitioner's factual and constitutional challenges to the BIA's taking of administrative notice as to changed country conditions in Iraq. Petitioner's own motion to reopen is pending before

No. 04-3303

Abbo v. Gonzales

the BIA, and these issues as to current country conditions pertinent to petitioner can be litigated there. *Cf. Mirza v. Gonzales*, No. 04-3649, 2005 U.S. App. LEXIS 19507 (6th Cir. Sept. 7, 2005).