*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0348p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT



FATOUMATA SIRA BAH,

*Petitioner,*

*v.*

No. 04-3454

ALBERTO R. GONZALES,

*Respondent.*

On Petition for Review of an Order
of the Board of Immigration Appeals.
No. A95 254 832.

Argued: June 7, 2005

Decided and Filed: September 8, 2006

Before: SILER and GIBBONS, Circuit Judges; LAWSON, District Judge.[*]

---

## COUNSEL

**ARGUED:** Robert B. Huntington, Wayland, Massachusetts, for Petitioner. James E. Grimes, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Antonio Sambrano, Boston, Massachusetts, for Petitioner. James E. Grimes, Mary Jane Candaux, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

SILER, J., delivered the opinion of the court. GIBBONS, J. (pp. 6-7), delivered a separate concurring opinion. LAWSON, D. J. (pp. 8-12), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

SILER, Circuit Judge. Petitioner Fatoumata Sira Bah seeks review of a final order of removal entered by the Board of Immigration Appeals ("BIA"). This order affirmed an Immigration

---

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

Judge's ("IJ") decision to deny her applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). We deny the petition for review.

## I.

Bah is a native and citizen of Guinea. She claims that at the age of eight she was subjected to female genital mutilation ("FGM"). Additionally, she claims that she and her husband were members of the political party "Rally of the Guinean People" ("RPG"), an opposition party for which she claims her cousin Alpha Sow is a leader. She contends that she and her husband recruited new members to RPG and communicated decisions of the RPG leadership to the general membership.

Bah alleges that following the December 14, 1998, presidential election in Guinea, she and her husband attended an RPG meeting led by Sow. A demonstration was then held at party headquarters to protest the arrest of Alpha Condé, the RPG candidate. This demonstration was disrupted by the military and resulted in the arrest of many demonstrators, including Bah, who were detained at a military camp. She was initially placed in a large room with other detainees, but then was taken to a smaller room for questioning. She was later taken to a six square-foot cell equipped only with a bucket for personal use. After a night in the cell, she was released with the orders to cease demonstrating and to remain in town so as to be available for future questioning.

Upon her return home, Bah learned her husband was still detained. She claims she was questioned at her home every three days or so by three or four soldiers. She continued to participate in RPG activities which resulted in a second arrest in November 1999. She was ultimately taken to Sureté prison and placed in a small cell. She claims that evening she was beaten, leaving scars on her legs and ankles, and raped. She remained in Sureté for 18 months, during which time she was allegedly raped, interrogated about twice a month, and beaten about four times a month. She was released in May 2001 and supplied money for transportation.

At this time, Bah's brother arranged her transportation to the United States. She entered the country without permission, utilizing false travel documents. She applied for asylum stating that she had been persecuted on account of her involvement with the RPG. Bah was interviewed by an Asylum Officer who determined that she was not credible. The Immigration and Naturalization Service served a Notice to Appear charging her with being removable under 8 U.S.C. § 1182(a)(6)(A)(I), as an alien present in the United States without having been admitted. Bah subsequently "admitted the factual allegations contained in the Notice to Appear, conceded removability, and indicated an intention to apply for asylum, withholding of removal, and protection under the Convention."

Following a hearing, the IJ issued an oral decision finding Bah removable and denying her applications for asylum, withholding of removal, and relief under the CAT. The BIA affirmed the IJ's decision without written opinion under the streamlining procedure in 8 C.F.R. § 1003.1(e)(4) and designated the IJ's decision as the final agency determination for purposes of review.

## II.

The IJ has discretion to grant asylum to any alien who qualifies as a "refugee," 8 U.S.C. § 1158(a) & (b), meaning an alien who is unable or unwilling to return to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Even if the alien qualifies as a refugee the IJ may use his discretion to deny asylum. 8 U.S.C. § 1158(a) & (b). Therefore, a request for asylum involves a two-step inquiry: (1) determining whether the petitioner qualifies as a refugee, and (2) whether the petitioner merits a favorable exercise of discretion by the IJ. *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004).

The IJ's factual determination as to whether the alien qualifies as a refugee is reviewed under a substantial evidence test. *Id.* The IJ's decision regarding eligibility for asylum is to be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). And reversal is available only if the petitioner presents evidence sufficient that a reasonable factfinder would have to conclude that the requisite fear of persecution existed. *Yu*, 364 F.3d at 702; *Ouda v. I.N.S.*, 324 F.3d 445, 451 (6th Cir. 2003) (reversal allowed if the evidence presented "not only supports a contrary conclusion, but indeed *compels* it.").

## III.

### A. "STREAMLINING"

Bah argues that the BIA's brief dismissal of her appeal constituted a violation of her due process rights. However, the BIA has the authority to affirm, without opinion, or issue a brief opinion, in any case in which the Board member concludes that there is no legal or factual basis for reversal of the decision by the Service or the IJ. 8 C.F.R. § 1003.1.[1] This provision permits the BIA to issue summary affirmances in immigration appeals meeting certain criteria. Bah suggests that the use of streamlining ignores the "assumptions of Congress concerning the administrative foundations" of administrative review. "This court, however, has recently examined the use of summary affirmances, concluding that their use does not violate due process." *Ramani v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004) (citing *Denko v. INS*, 351 F.3d 717, 726-30 (6th Cir.2003)).[2] Accordingly, the application of the streamlining process did not violate Bah's due process rights.

### B. BAH'S CREDIBILITY

For asylum, Bah "must demonstrate that [she] qualifies as a refugee by producing evidence that [she] has suffered past persecution or has a well-founded fear of future persecution." *Yu*, 364 F.3d at 703. As stated above, the IJ's determination of Bah's credibility is reviewed under the highly deferential "substantial evidence" standard, and is reversed only if "any reasonable adjudicator would be *compelled* to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (emphasis added). As in *Yu*, the decision of the IJ regarding Bah's credibility should be upheld "because the IJ laid out numerous grounds for his adverse credibility finding." 364 F.3d at 703.

The IJ noted discrepancies between Bah's statements to the Asylum Officer during her earlier interview, her application, and her later testimony. Specifically, Bah claimed to be actively involved in the RPG to the point of attending national meetings of the party. She admitted, "I did not make decisions during these [headquarters] meetings, it was my job to inform the other members of the party of the decisions that had been made by the leaders and the reasons why these decisions had been made," and that she made clothes for the party and recruited members. The IJ remarked that "her level of involvement would not seem to entitle her to go to the meetings in Matan, although, perhaps, as a cousin of [Sow], she had special dispensation." When meeting with the

---

[1] Pursuant to 8 C.F.R. § 1003.1(e)(4)(i), a single member of the BIA may affirm the decision of the IJ without opinion if the Board member determines that: (1) "the result reached in the decision under review is correct;" (2) "any errors in the decision under review were harmless or immaterial"; and (3) either that "(A) [t]he issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation"; or "(B) [t]he factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case." 8 C.F.R. § 1003.1(e)(4)(i).

[2] Additionally, we have stated that the "streamlined-affirmance-without-opinion procedure is not a dismissal, but instead a review of the merits of an appeal." *Hassan v. Gonzales*, 403 F.3d 429, 433 (6th Cir. 2005) (citing *Denko*, 351 F.3d at 729 (noting that streamlining cases receive full consideration from the BIA)).

Asylum Officer, however, she was neither unable to identify what the initials RPG stood for, nor was she able to describe the party logo. At her hearing before the IJ, she was able to identify the full name of the RPG, but was still unable to fully describe the logo.

Bah also stated in her application that only her husband was arrested at a protest on December 17, 1998, and that nearly a year later, on November 18, 1999, she was arrested and taken to Sureté. These claims were repeated in her interview with the Asylum Officer. However, both in her declaration and before the IJ she claims she was also arrested on December 21, 1998. Bah now contends that "this error was made by the person who originally filled out [the] asylum application, [and] that she did not correct it because she could not read English, and that she told the asylum officer the correct date." However, a translation error does not reconcile that on two instances she stated that she and her husband were arrested, and on two other instances she claimed that the two of them were arrested eleven months apart. Additionally, in her application, she failed to "provide a detailed explanation of [her or her] relatives' involvement" with RPG, as required; instead, she merely claimed to be a member of RPG and a supporter of Alpha Condé.

Initially, she described soldiers equipped with gas masks "fir[ing] tear gas canisters among and all over the people" following the December 1998 demonstration. Before the IJ she described what seems to be pepper spray – "It's something ... spicy, something like when you eat it, its spicy and hot. . . . It's not actually gas," – sprayed into individual faces. There are also discrepancies regarding how she left the prison. In her initial application, she stated that on May 1, 2001, her brother arranged her escape from prison. At that time he told her that her house had been destroyed by the government and that her children were living with her mother in the village. Later, she stated that she was released for unknown reasons on May 2 and given 200 franc Guinea for cab fare. In this version, she arrives at her brother's home where he informs her that she is to travel to America. There is no mention of the destruction of her house.

Finally, before the IJ, Bah rested her asylum claim in part on her fears that her four daughters would be subject to FGM. This claim was not articulated in her original application, nor was it apparently articulated to the Asylum Officer. It was, however, included in the declaration written after the interview with the Asylum Officer. Bah states that she is fearful that her daughters will be subjected to FGM, and she wishes to prevent it, but that if they remain in Guinea she will not be able to. The IJ discounted Bah's fears because she left her daughters in the care of her mother – who presumably ensured that Bah underwent the procedure – rather than seeking to either bring her daughters with her or find them alternative housing. According to a State Department Report, FGM is illegal in Guinea, and Bah has not shown that her family would subject her daughters to FGM over her opposition; however, Bah's mother allegedly wrote: "you know that your daughters must be excised because they are old enough."

The IJ's determination that Bah lacked credibility was not based on overwhelming evidence; however, Bah has not met the "high standard of *compelling* a contrary result." *Yu*, 364 F.3d at 700. Accordingly, the IJ's decision is based on reasonable, substantial evidence.

## C. FEMALE GENITAL MUTILATION

In *Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004), we noted that FGM has been internationally recognized as a violation of women's and female children's rights. Further, "as part of the Illegal Immigration Reform and Immigrant Responsibility Act [IRRIRA], Congress [has] criminalized the practice of female genital mutilation under federal law." *Id.* at 638-39; *see* 18 U.S.C. § 116 (whoever "knowingly circumcises, excises, or infibulates the whole or any part of the labia majora or labia minora or clitoris of another person who has not attained 18 years" shall be fined or imprisoned). Here, Bah has testified that she underwent FGM when she was eight years old. This was verified by a doctor in Memphis.

Bah relies primarily upon *Abay*. However, *Abay* is of less aid then she believes. In *Abay*, we granted an alien mother asylum in her own right based on her fear that her minor daughter (also an asylum applicant) would be subjected to FGM if they were deported. *Abay*, 368 F.3d at 634. In reaching an affirmative conclusion, the court relied on case law in which deportation of an alien applicant would also remove an at-risk person. *Id*. at 642; *see Matter of Dibba*, No. A73 541 857 (BIA Nov. 23, 2001) (custodial alien mother granted asylum based on her fear that her citizen daughter would be subject to FGM in Gambia); *Matter of Adeniji*, No. A41 542 131 (oral decision) (U.S. Dept. of Justice, Immigration Court, York, Penn., Mar. 10, 1998) (granting application for withholding of removal to alien father on grounds that his citizen daughters would be forced to return to Nigeria with him and would be subjected to FGM despite his wishes); *Matter of Oluloro*, No. A72 147 491 (oral decision) (U.S. Dept. of Justice, Immigration Court, Seattle, Wash., Mar. 23, 1994) (granting suspension of deportation to an alien mother because the risk that her U.S.-born daughters would be subjected to FGM in Nigeria "posed an extreme hardship" to the daughters).

Bah claims that if she were granted asylum, she would be able to bring her daughters here to protect them.[3] Unfortunately, it seems she has performed her steps backward.[4] Unlike *Abay*, Bah's daughters are not in the United States. They are currently in Guinea, and are currently exposed to all accompanying risks of FGM. Unlike the parents in *Adeniji* or *Oluloro*, her daughters are not citizens who would be removed with their custodial parent. *Abay*, 368 F.3d at 342 ("Normally a mother would not be expected to leave her child in the United States in order to avoid persecution.") (citing *Matter of Dibba*, No. A73 541 857 at 2). Nor, as in *Abay* or *Dibba*, has she brought her alien daughters, with their independent FGM claims, into the United States. *Abay*, 368 F.3d at 642.

To the extent that Bah has based her asylum grounds on the fear that her daughters would be subjected to FGM if she is returned to Guinea, her case is distinguished from *Abay*. As noted above, her daughters are, in all likelihood, presently at risk. However, Bah has not removed them to the United States to seek asylum, instead choosing to leave them with those who she believes may harm them. Unlike *Abay*, her daughters are not here seeking asylum in their own rights based on their fears of FGM and persecution. Accordingly, *Abay* does not support Bah's asylum argument.

Because Bah cannot show that she qualifies for asylum, she cannot meet the more stringent standards required to qualify for the protections of withholding of removal or under CAT. *See Hassan*, 403 F.3d at 435.

Petition for review DENIED.

---

[3] Should Bah receive asylum, her unmarried daughters, so long as they are younger than 21, 8 C.F.R. § 208.21(d), "also may be granted asylum if accompanying, or following to join ... unless it is determined that [they are] ineligible for asylum." 8 C.F.R. § 208.21(a).

[4] Judge Sutton's concurrence in *Abay* addressed his concerns that the majority appeared to state: "(1) that women or girls may never be deported to a country where the incidence of FGM within the female population as a whole is high, regardless of the risk that a particular applicant will be subjected to FGM, and (2) that the parents of such children may not be deported either." 368 F.3d at 643 (Sutton, J., concurring).

---

**CONCURRENCE**

---

JULIA SMITH GIBBONS, Circuit Judge, concurring.  I agree with the majority opinion's discussion of Bah's claims of political persecution and agree that we should deny Bah's petition for review.  I differ from both of my panel colleagues, however, in my analysis of the FGM claim.

Judge Lawson interprets the IJ's oral opinion as basing its rejection of the FGM claim on a generalized determination that Bah was not credible in her accounts of political persecution and therefore not credible with respect to her FGM claim.  Although the IJ's opinion is not entirely clear on this point, I believe a closer reading reveals that the IJ first concluded that Bah could not prevail on her claim based on the fact that she had undergone FGM because she had failed to prove it was forced.  Then the IJ found her claim based on her fears for her children not to be credible because he believed she was the ultimate decisionmaker with respect to whether her daughters would undergo FGM.  Finally, the IJ noted that there was a better chance that Bah's wishes would control her daughters' fate if she returned to Guinea.

Judge Siler's opinion treats the FGM claim as resting entirely on Bah's assertion that she has a well-founded fear that her four daughters, who remain in Guinea,  will be persecuted by undergoing FGM.  While I agree that Bah regards this aspect of her claim as most important, based on language in her brief, she also apparently asserts a claim of persecution based on the fact that she herself has undergone FGM.  Her discussion of this claim is quite conclusory, however, and largely amounts to a challenge to the IJ's finding that she had to prove that she physically resisted FGM.

Analyzing the two FGM claims separately and interpreting the IJ opinion in this way leads me to several points.  First, the IJ made a legal error in assuming that Bah had to prove that she forcibly resisted FGM at the time the procedure was performed on her when she was eight years old in order to establish her claim based on the fact that she had undergone FGM.  An eight year old girl's failure to physically resist a procedure performed by medical personnel[1] and endorsed by her mother hardly establishes her consent or renders the procedure unable to be categorized as persecution.  Because the IJ went astray at this first step of his analysis, he gave no further consideration to Bah's claim of persecution on this basis.

Though the IJ erred in concluding that Bah was not eligible for asylum because she failed to resist FGM, this error does not necessarily require remand.  Assuming that Bah was subject to persecution based on FGM,[2] a finding of past persecution gives rise to a rebuttable presumption that Bah will be subject to future persecution.  8 C.F.R. § 1208.13(b)(1)(i).  Here, however, Bah makes no argument that the government did not rebut this presumption, thereby conceding that "there is no chance that [Bah] would be personally [persecuted] again by the [FGM] procedure."  *Oforji v.*

---

[1]While FGM may not always be performed by medical personnel, Bah testified that in her experience it was done in a hospital or by doctors who came to the home.

[2]Because FGM may amount to persecution, at least in many of its forms, *see Abay v. Ashcroft*, 368 F.3d 634, 638 n.1 (6th Cir. 2004) (discussing the types of FGM), I simply assume for ease of analysis that clitoral excision, the type of FGM to which Bah was subjected, qualifies as persecution.  I also do not resolve the issue of whether the FGM described by Bah relates to one of the five categories required for a grant of asylum.  *See* 8 U.S.C. § 1101(a)(42)(a).

*Ashcroft*, 354 F.3d 609, 615 (7th Cir. 2003).[3]  Instead, all of Bah's discussion of future persecution focuses on her children.  Because Bah has not argued that the government has not rebutted the presumption, further discussion of Bah's claim based on her own FGM is unnecessary.

Second, in considering Bah's claim with respect to her fears for her children, I agree with Judge Siler that the IJ's credibility determination was hardly supported by overwhelming evidence. But I also agree with him that Bah's evidence did not compel a contrary result.  Bah testified that she could not prevent her daughters from undergoing female circumcision,[4] except by removing them from the country because "they do it to all of the children in the country." This conclusory testimony was her sole offering on this subject.  She did not indicate that she had communicated her wishes regarding female circumcision to any family member or explain how her wishes as a parent of minor children would be disregarded by her family or medical personnel.  She did not discuss the views of the children's father, and the evidence indicates that he is not with the children.  Other evidence makes clear that FGM, although widespread, is illegal in Guinea and calls into question Bah's assertion that it is performed on all children.  Bah also did not elaborate on her comment about removing children from the country.  There is no indication that she considered this option in the case of her own children.

I also agree with Judge Siler's comments that *Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004), does not provide much support for Bah's position.  *Abay* was decided after Bah's hearing before the IJ.  Perhaps if Bah had the benefit of reviewing *Abay* before her hearing, she would have formulated an argument that its reasoning should extend to her situation and justify a grant of asylum to her.[5]  But while this particular case was not available, Bah did raise the general issue of her fears for her children as a basis for granting her asylum, and she had every opportunity to develop a factual record concerning this issue before the IJ.  Applying new case law would not alter the IJ's credibility determination, which cannot be overturned given our standard of review.  For this reason, I disagree with Judge Lawson that remand to permit the IJ and the BIA to apply *Abay* is required.

---

[3]In several cases asylum applicants have successfully produced evidence indicating a risk of further mutilation. *See Tunis v. Gonzales*, 447 F.3d 547, 550 (7th Cir. 2006) (noting applicant could reasonably fear repetition of the procedure because the initial excision was incomplete); *Mohammed v. Gonzales*, 400 F.3d 785, 800-01 (9th Cir. 2005) (noting that petitioner was potentially at risk of further genital mutilation because 80 percent of all Somalian women, and particularly members of minority clans, are subject to infibulation in addition to excision).  Here Bah does not contend that she fears or is at risk of any future harm related to FGM.

[4]This was the term used for FGM at the hearing before the IJ.

[5]As Judge Lawson notes, the children of an alien granted asylum may be admitted into the United States as derivative asylum beneficiaries.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

DAVID M. LAWSON, District Judge, concurring in part and dissenting in part. I concur in the part of the majority opinion that rejects Fatoumata Sira Bah's asylum petition to the extent that it is based on alleged persecution for her political affiliation and activities because I believe that Bah has not shown that the Immigration Judge's adverse credibility determination concerning those activities is erroneous under the applicable review standard. *See* 8 U.S.C. § 1252(b)(4)(B) (declaring that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"); *see also Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004) (explaining that "we . . . review[] the IJ's adverse credibility determination for 'substantial evidence,' reversing only if 'any reasonable adjudicator would be compelled to conclude to the contrary'") (quoting section 1252(b)(4)(B)). The majority has documented well the inconsistencies in Bah's testimony concerning that contention, which "go to the heart of the applicant's claim." *Sylla v. I.N.S.*, 388 F.3d 924, 926 (6th Cir. 2004). I also agree that *Denko v. I.N.S.*, 351 F.3d 717 (6th Cir. 2003), conclusively disposes of Bah's challenge to the affirmance-without-opinion practice apparently adopted by the Bureau of Immigration Appeals in this case. I disagree, however, with the majority's disposition of Bah's claim that she should be granted asylum based on the well-founded fear that her daughters will be subjected to female genital mutilation (FGM). Bah's theory is indeed a novel one – that she should be allowed to remain in the United States so that she can bring her daughters here and thereby protect them from this abusive practice – and in advancing it she seeks an extension of the holding in *Abay v. Ashcroft*, 368 F.3d 634 (6th Cir. 2004). The IJ did not consider that theory, in part because he rejected the claim out of hand based on a general rejection of Bah's credibility. I find wanting the IJ's credibility determination with respect to the FGM claim, and I would remand the case for further consideration of that issue and for initial consideration on Bah's new theory.

I.

In rejecting the petitioner's claim based on FGM, the IJ wrote:

> Circumcision or FGM is very common in may [sic] cultures in the world. It is part of the cultural matrix in which people live. Most people think more of it other than it is a rite of passage and it is necessary part of life. It is analogous to forced abortion. Forced abortion is clearly persecution under the case law, even before the Act incorporated it. However, women voluntarily receive abortions all the time, and it is actually considered in this country to be a constitutional right. So, in order to receive asylum based on genital mutilation, respondent would have to show that she was mutilated against her will, or that her daughters have fear of mutilation despite everything that she could do for them.

J.A. 73. The IJ reasoned that the petitioner underwent female circumcision and there is no evidence that it was done against her will. He rejected the notion that Bah's mother, who approved of the procedure, could have been her "persecutor," and he concluded that there was no proof that the practice was sanctioned by the government of Guinea, and Bah could protect her daughters more effectively if she returned to Guinea.

I believe that the IJ's analysis of this aspect of the claim is flawed for several reasons. First, the IJ improperly disregarded evidence that Bah's mutilation was forced. This court has held that "[f]orced female genital mutilation involves the infliction of grave harm constituting persecution on account of membership in a particular social group that can form the basis of a successful claim for asylum." *Abay*, 368 F.3d at 638. The immigration judge correctly required the petitioner to demonstrate that her mutilation occurred against her will, but incorrectly required her to show some

form resistance to the procedure and failed to consider evidence that the procedure was forced upon her. The petitioner testified that she was eight years old when she was circumcised, while under the care of her mother who is threatening in a letter to have the procedure performed upon the petitioner's daughters. She testified that her mother believes the women of Guinea are required to undergo the procedure:

Q. What is your mother's opinion regarding circumcision?
A. I asked her but she say that they have to do it because of the country you have to do it, so they can't do anything about it.

J.A. 102. The petitioner testified that she opposes the procedure:

Q. What is your opinion about female circumcision?
A. If they was asking my opinion, they should not do it to anybody.
Q. Why not?
A. Because you have lot of problem and it's painful.
. . .
Q. Well can't you prevent your children from being circumcised?
A. The only way is to take them out of there.
Q. Well, if you, why can't you do anything about it?
A. Because I can't do anything about it.

J.A. 101.

The State Department report on Guinea in the record also provides indirect evidence that the procedure was forced on the petitioner. It reports that the painful, medically-threatening, and illegal procedure continues to be "performed on girls and women" in high numbers:

Female genital mutilation (FGM), which is condemned widely by international health experts as damaging to both physical and psychological health, is very widespread. It is practiced widely in all regions and among all religious and ethnic groups. FGM is illegal under the Penal Code, and senior officials and both the official and private press have spoken against the practice; however, there have been no prosecutions for violations of the code. FGM is performed on girls and women between the ages of 4 and 70, but exact figures on this procedure are difficult to establish. The Coordinating Committee on Traditional Practices Affecting Women's and Children's Health (CPTAFE), a local NGO dedicated to eradicating FGM . . . estimat[es] the figure to be between 65 and 75 percent. A 1999 Demographic Health Survey estimates that more than 99 percent of females undergo FGM. Expert estimates vary between 65 and 90 percent.

J.A. 278. None of the evidence demonstrates that the petitioner consented to the procedure. Although the evidence does not directly show that she resisted her own mutilation, the evidence indicates that the procedure was forced upon her. I believe the IJ erred by not considering the available evidence when deciding the petitioner's asylum claim on this ground.

Second, the IJ found that the petitioner's mother could not be her persecutor. This determination is contrary to the established law of the Sixth Circuit. In *Abay*, this court granted asylum to a mother for fear that her daughter would undergo mutilation from the child's grandmother, future husbands, or in-laws. 368 F.3d at 639. Family members, including parents, may persecute each other, and therefore they may be the source "of a well-founded fear of persecution on account of . . . membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A).

Third, the immigration judge improperly rejected Bah's claim on a generalized finding that she was not credible. The respondent argues that the immigration judge properly rejected the petitioner's argument after he found none of her testimony credible because an overall rejection of credibility can be applied to every asserted ground for asylum, citing *United States v. Bao*, 189 F.3d 860 (9th Cir. 1999). In *Bao*, a criminal case, the court held that "[a] prior inconsistent statement is admissible to raise the suggestion that if a witness makes inconsistent statements, then his entire testimony may not be credible." *Id*. at 866. However, the respondent's argument fails to recognize established Sixth Circuit law that in immigration cases, "[a]n adverse credibility finding must be based on issues that go to the heart of the applicant's claim. 'They cannot be based on an irrelevant inconsistency.'" *Sylla*, 388 F.3d at 925-26 (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004)). This court has applied that principle to reject a determination that a petitioner did not sustain his burden of demonstrating he had been tortured, holding:

> Although the IJ denied Singh relief under the Convention Against Torture, the IJ did not include in her decision a finding as to whether Singh's testimony that he had been tortured was credible or not, but rather simply made a generalized adverse credibility finding. J.A. at 50 (IJ Decision at 14) (rendering no specific credibility finding regarding torture allegations, concluding only that, "Respondent is incredible on the very events which underlie his claim. His documents are unreliable, and his *claim of persecution* in the past by the KLF, by the police, all *because of imputed political opinion* fail.") (emphases added). The BIA, in reviewing the IJ's decision, similarly failed to make a specific credibility finding with respect to Singh's testimony that he was tortured, merely reiterating that, "in light of the Immigration Judge's adverse credibility determination, we find that the respondent did not demonstrate by sufficiently consistent and credible testimony that it is more likely than not that he would suffer torture if returned to India." J.A. at 4 (BIA Order). Because neither the IJ nor the BIA made a specific finding as to whether Singh's testimony that he was tortured was credible, we vacate the BIA's decision with respect to Singh's Convention Against Torture claim and remand for further consideration of this claim.

*Singh v. Ashcroft*, 398 F.3d 396, 405 (6th Cir. 2005); *see also Balasubramanrim v. I.N.S.*, 143 F.3d 157, 165 (3d Cir. 1998) (noting that "[b]ecause the Board found Balasubramanrim [the petitioner] not credible, it rejected his application for asylum and withholding of deportation without conducting further analysis of his claim. In the absence of substantial evidence supporting a finding of adverse credibility, the BIA is required explicitly to consider a petitioner's claims for asylum and withholding of deportation. We will grant the petition and remand to the Board, with leave to further remand to the immigration judge, for a determination of Balasubramanrim's claims for asylum and withholding of deportation without reliance on the adverse credibility finding") (internal quotes and citations omitted). An IJ and the BIA cannot avoid the requirement of connecting testimonial inconsistencies to a petitioner's asylum claims by the simple expedient of making a generalized credibility determination. Here, the immigration judge rejected Bah's testimony concerning female genital mutilation because "taken as a whole, I do not find the respondent's story to be credible." (J.A. 74). I believe this finding is insufficient to withstand review under our standard for assessing credibility determinations. I would remand for redetermination of the claim that Bah has a well-founded fear of persecution because of the real prospect that her daughters will be subject to FGM.

II.

However, as the majority correctly notes, Bah's citation to *Abay v. Ashcroft* does not establish her claim to asylum because of the obvious distinguishing fact that Abay's daughters resided with their mother in the United States, while Bah's daughters remain in Guinea, potentially subject to the abuse that Bah has described. The majority does not hold that an asylum claim based on those facts must fail as a matter of law; it simply states that *Abay* is distinguishable and does not itself support

Bah's asylum argument. I agree. However, I would not foreclose such a claim in this case altogether.

In *Abay*, this court held that a petitioner could receive asylum on the basis of a fear of taking her daughter to their home country after being denied asylum and "being forced to witness the pain and suffering of her daughter" and found that there was a "governing principle in favor of refugee status in cases where a parent and protector is faced with exposing her child to the clear risk of being subjected against her will to a practice that is a form of physical torture causing grave and permanent harm." 368 F.3d at 642. The court determined that the claim was not derivative, but based on the persecution the parent would suffer at seeing the child mutilated.

The immigration judge rejected the claim because he mistakenly understood that the petitioner's decision concerning her daughters' submission to FGM "should be dispositive." J.A. 74. He found that the mutilation would only occur with family approval, and "there is no reason to believe it would be done by the family over the family's [meaning the petitioner's] opposition." *Ibid*. He concluded that the petitioner did not submit sufficient evidence that she could not protect her children from the process, and that the children would be safer if her mother returned to Guinea.

The immigration judge improperly denied the petitioner's claim on this ground because he again failed to consider all of the evidence in the record. He ignored testimony of the petitioner based on a generalized finding that she was not credible. As noted earlier, the petitioner testified that the only way to avoid the procedure "is to take them out of there," and given the family environment the petitioner herself "can't do anything about it." J.A. 101.

The IJ appears to have ignored the evidence that the petitioner was circumcised herself, J.A. 244; that female genital mutilation is prevalent in Guinea despite its national laws, J.A. 278; and that the children are in the care of a grandmother who threatens in a letter to have the procedure done to the girls. J.A. 253. This court in *Abay* found similar evidence demonstrative of a well-founded fear that the petitioner's daughters would be persecuted through female genital mutilation. *Abay*, 368 F.3d at 642 (finding that evidence compelled finding that the petitioner had well-founded fear that she would be persecuted by her daughters' genital mutilation based on evidence that "female genital mutilation is 'nearly universal' in Ethiopia; that Abay [the petitioner] herself underwent the procedure at a young age; that Abay's mother has already attempted to mutilate Abay's older daughters . . ., that Abay would not be able to override any of her daughters' future husbands or in-law's wishes; and that the government of Ethiopia does not as a practical matter, enforce laws intended to curb harmful traditional practices").

The petitioner here seeks an extension of *Abay*, arguing that she is entitled to asylum in order to have the ability to bring her children to the United States for protection. That is not an entirely unreasonable proposition, given the conceptual grounds of decisions granting a parent asylum on the basis of the threat of mutilation of a daughter, which is that denying the parent asylum will force the parent to subject the child to the threat of persecution. *See, e.g. Abay*, 368 F.3d at 641-42, and the decisions on which it relied: *Matter of Dibba*, No. A73 541 857 (BIA Nov. 23, 2001) (mother granted asylum based on her fear that her daughter, a resident and a citizen, would be subject to FGM in Gambia); *Matter of Adeniji*, No. A41 542 131 (oral decision) (U.S. Dept. of Justice, Immigration Court, York, Penn., Mar. 10, 1998) (granting application for withholding of removal to alien father on grounds that his daughters, also citizens, would be subjected to FGM against his wishes upon his return with them to Nigeria); *Matter of Oluloro*, No. A72 147 491 (oral decision) (U.S. Dept. of Justice, Immigration Court, Seattle, Wash., Mar. 23, 1994) (granting suspension of deportation to a mother whose daughters were U.S.-born because they would be subjected to FGM in Nigeria). Moreover, as the government informed the court in a supplemental filing, the children of an alien granted asylum may be admitted into the United States as derivative asylum beneficiaries. *See* 8 C.F.R. § 208.21 (2005).

The immigration judge did not base his rejection of Bah's claim that her daughters' subjection to FGM supported her own asylum petition on the ground that *Abay* or the immigration law did not extend to the non-resident children who are the object of possible persecution, and the government did not explicitly address this theory in its brief. The petitioner did not make a claim on this ground in her request for asylum, but she raised the issue on appeal and exhausted the claim before the immigration judge and the board of immigration appeals. Neither did the agency consider the issue, and I believe that the IJ or the BIA should address the claim in the first instance. Therefore, I would remand this matter for a determination whether an individual claim by a parent under *Abay* can be asserted without the child's presence in the United States, and whether the petitioner has asserted a meritorious claim on that ground. *See I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (holding that "a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands").

## III.

I concur in the court's decision to deny the petition for review of the denial of asylum on the ground of political persecution. However, I must dissent from majority's declination to remand the petitioner's claim for asylum based on her well-founded fear that her daughters will be subjected to female genital mutilation.