**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0685n.06

**No. 08-4609**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Oct 15, 2009**
LEONARD GREEN, Clerk

|                              |     |                                     |
| ---------------------------- | --- | ----------------------------------- |
| BALWINDER SINGH,             | )   |                                     |
|                              | )   | ON REVIEW FROM THE                  |
| **Petitioner,**              | )   | BOARD OF IMMIGRATION                |
|                              | )   | APPEALS                             |
| v.                           | )   |                                     |
|                              | )   |                                     |
| ERIC H. HOLDER, JR.,         | )   | **O P I N I O N**                   |
| ATTORNEY GENERAL,            | )   |                                     |
|                              | )   |                                     |
| **Respondent.**              | )   |                                     |
| _____ | )   |                                     |

**Before: SUTTON, KETHLEDGE, and WHITE, Circuit Judges.**

**WHITE, Circuit Judge.** Petitioner Balwinder Singh (Singh) seeks review of the October 31, 2008 order of the Board of Immigration Appeals (BIA) affirming without opinion the Immigration Judge's decision denying Singh's application for asylum and withholding of removal pursuant to the Immigration and Nationality Act (INA), and for relief pursuant to the Convention Against Torture (CAT). We **DENY** Singh's petition for review.

## I. BACKGROUND

### A. Singh's Account

The following is Singh's account of the relevant events as given during his testimony at the hearing before the Immigration Judge (IJ).[1]

---

[1]Singh speaks Punjabi. He testified at the hearing using a translator.

Singh was born in Sekhwan village in Punjab, India, in 1965. Like his parents, he is a member of the Sikh religion. Both Sikhs and Hindus – the majority religion in India – live in the Punjab region. Singh explained that the Sikhs are different from the Hindus in that they wear turbans and keep their beards long.

Singh's father was involved in the Akali Dal political party and supported a leader of the party at the time, who was from the Sekhwan village. After that leader died, *his* son, Sewa Singh, became a leader in the party. When Sewa Singh came to power, Singh joined him and started working with him. Singh began working with Sewa Singh when Singh was between the ages of 20 and 25. Singh testified he first joined the Akali Dal party after the elections in 2002, and held a position on the "block committee" of Sekhwan village. Singh's job as a taxi driver allowed him to assist Sewa Singh with the use of his vehicle on election day. Singh went house to house to tell people to vote and also transported those who lived far away to the polling places.

Singh first had problems with the Congress Party – and more specifically, a leader of the Congress Party, Partab Singh – in June 2002. In 2002, the Congress party won "the election." According to Singh, fifteen days before the election, Partab Singh sent a messenger to tell Singh that he wanted Singh to leave the Akali Dal party and Sewa Singh. Singh refused.

On June 6, 2002, police came to Singh's house, arrested him, took him to the police station and beat him. Singh stated that he was beaten with bamboo sticks, that large steel rollers were used on his legs, and that his collar bone was broken. The police told him he should give a statement that Sewa Singh had corruptly taken money from a local hospital, but he refused. Partab Singh was behind this event. Singh was released one week later, on June 13, 2002, after his family paid a bribe to the police to secure his release. According to Singh, upon his release, police warned him not to

tell about the abuse or Partab Singh would create more problems for him. Singh stated that he still has medical problems related to the event.

Singh told Sewa Singh about what had happened to him, but Sewa Singh did not want to confront Partab Singh because Partab Singh was too powerful at the time. According to Singh, he was arrested again on January 15, 2003, at an Akali Dal meeting in his farmhouse, and was taken to the police station where he was placed on the floor, tied at the hands and legs, and had steel rollers used on his body. According to Singh, while police beat him, they asked him to say something against Sewa Singh, in particular that Sewa Singh was taking the people's money and purchasing cars. According to Singh, Partab Singh was behind the police's actions. Singh was released on January 23rd (eight days later), after bribe money was again paid for his release.

The third significant event occurred on April 17, 2003. Two persons hired Singh's taxi to go to Amritsar. As he approached a police checkpost, the individuals instructed him not to stop. One put a gun to his neck. Fearful, Singh did not stop at the checkpoint and kept driving until the individuals instructed him to stop at the railroad crossing. He did and they ran into the dark. The police had chased Singh and searched his car. They found a leather bag the men had left on the back seat that contained an opium-related substance. Singh was taken to the police station and again asked to make a statement against Sewa Singh. According to Singh, he was held for five days and beaten badly. Again, a bribe was paid in order to secure his release, and police told him not to tell anyone. This time they told Singh to leave Punjab or risk being killed.

After he was released, Singh went to stay at a Sikh temple (a "Gurdwara") in Delhi. After leaving and coming back, he was told that police had been there looking for him. Out of fear for his safety, Singh sought the assistance of an individual who could arrange for him to leave the country.

He went on a multi-country journey and eventually entered the United States through Mexico on May 30, 2003.

## B.    Immigration Proceedings

On October 28, 2003, Singh filed an application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture (CAT) based upon his membership in and involvement with Akali Dal.

Singh's application was not granted, and on December 4, 2003, the Department of Homeland Security issued Singh a Notice to Appear charging him with being removable as an "alien present in the United States [who has not been] admitted or paroled" under 8 U.S.C. § 1182(a)(6)(A)(i). On October 25, 2007, an IJ conducted a hearing on Singh's application. In an oral decision that same day, the IJ denied Singh's application and ordered him removed to India. In particular, the IJ found Singh not to be credible. The court found him to be at times non-responsive, implausible, and inconsistent, and concluded that "cumulatively or in the aggregate, these discrepancies and inconsistencies and points of implausibility justify an overall adverse credibility finding in this case." The court further found that the other evidence submitted by Singh was not sufficient to meet Singh's burden of proof to show a well-founded fear of persecution. The IJ further concluded that even if Singh had established a well-founded fear of persecution based on past events, the government had overcome the presumption of a well-founded fear of future persecution by presenting sufficient evidence that conditions in Singh's country had changed. Finally, the IJ found that Singh's failure to meet his burden as to his asylum claim indicated a similar failure to raise a successful claim for withholding of removal or protection under the CAT.

Singh appealed and the BIA affirmed the IJ's decision without opinion on October 31, 2008. Singh now petitions this court for review.

## II. ANALYSIS

**A.     Legal Standards**

Because the BIA affirmed the IJ's decision without an opinion, we review the IJ's decision directly. *See Denko v. INS*, 351 F.3d 717, 730 (6th Cir. 2003) ("[W]e evaluate the IJ's explanation as that of the Board."). In general, the IJ's legal conclusions are reviewed *de novo*, *see Ramirez-Canales v. Mukasey*, 517 F.3d 904, 907 (6th Cir. 2008), while factual findings (including credibility determinations) are reviewed for substantial evidence, *see Hassan v. Gonzales*, 403 F.3d 429, 434 (6th Cir. 2005). Under a substantial evidence standard, factual findings are to be treated as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.*

Under the Immigration and Nationality Act, asylum can be granted to an alien who qualifies as a "refugee," statutorily defined as someone who "is unable or unwilling to return to [his or her home country]" "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A).[2] An applicant is required to show three things in order to obtain refugee status:

> "(1) that he has a fear of persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that

---

[2]Although claims for asylum involve a two-step inquiry – first, whether the applicant qualifies as a refugee, and second, whether the applicant merits a favorable exercise of discretion by the IJ, *see Patel v. Gonzales*, 470 F.3d 216, 218-19 (6th Cir. 2006) – because the IJ's opinion concludes only that Singh is not a refugee within the meaning of the Act, the second step is not at issue here.

there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) that he is unable or unwilling to return to that country because of such fear."

*Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (quoting *Pilica v. Ashcroft,* 388 F.3d 941, 950 (6th Cir. 2004)). To show such a "reasonable possibility" of persecution, however, the applicant need not prove persecution by a preponderance of the evidence. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987) ("One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place."). Applicants who establish that they have suffered past persecution are presumed to have a well-founded fear of future persecution. *See Singh v. Ashcroft*, 398 F.3d at 401. But, this presumption may be rebutted by the government if it shows by a preponderance of the evidence that conditions in the country have changed so fundamentally that the applicant no longer has a well-founded fear of persecution or that the applicant could avoid future persecution by relocating (if reasonable) to another part of the country. *See* 8 C.F.R. § 1208.13(b)(1)(ii).

We "review the IJ's factual determination as to whether the alien qualifies as a refugee under a substantial evidence test." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). Under that standard, the IJ's findings receive significant deference; a reviewing court cannot reverse "simply because it is convinced that it would have decided the case differently." *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). Rather, the IJ's conclusion must be accepted unless "'any reasonable adjudicator would be compelled to conclude to the contrary.'" *Yu*, 364 F.3d at 702 (quoting 8 U.S.C. § 1252(b)(4)(B)). Determinations of credibility are considered factual findings, and are reviewed under the substantial evidence standard. *See Sylla*, 388 F.3d at 925.

"The trier of fact can base a credibility determination on all relevant factors including the applicant's demeanor and the consistency and plausibility of the various statements." *Ndrecaj v. Mukasey*, 522 F.3d 667, 674 (6th Cir. 2008) (internal quotation omitted); *see* 8 U.S.C. § 1158(b)(1)(B)(iii). While an IJ's credibility finding is afforded significant deference, the finding still must meet certain standards. It must be supported by specific reasons. *See Koulibaly v. Mukasey*, 541 F.3d 613, 620 (6th Cir. 2008). A finding of adverse credibility "must be based on issues that go to the heart of the applicant's claim." *Amir v. Gonzales*, 467 F.3d 921, 925 (6th Cir. 2006).[3] It cannot be based on "minor" or "irrelevant" inconsistencies. *Ndrecaj*, 522 F.3d at 674; *Sylla*, 388 F.3d at 926. "[D]iscrepancies may be relevant if they can be viewed as attempts by the applicant to enhance his claims of persecution." *Ndrecaj*, 522 F.3d at 674-75 (quotation marks omitted) (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 (6th Cir.2004)).

Eligibility for withholding of removal is based on the same five grounds that form the basis of an asylum claim – fear of persecution based on race, religion, nationality, membership in a particular social group, or political opinion. *See Singh v. Ashcroft*, 398 F.3d at 401. While the decision to grant asylum is a matter of the Attorney General's discretion, if a petitioner meets the requirements, withholding of removal is mandatory. *Id.* However, in order to qualify for withholding of removal, the petitioner must show a "clear probability," or more likely than not, that he would be subject to persecution in the proposed country of removal. *Almuhtaseb v. Gonzales*, 453

---

[3] The REAL Id Act of 2005 appears to have eliminated this requirement. *See, e.g.*, *Amir*, 467 F.3d at 925 n.4 ("The REAL ID Act of 2005 . . . changed the standard governing credibility determinations, stating that those determinations may be made without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim.") (citations and quotations omitted). However, this provision does not apply to this case – the provision applies only to aliens who applied for asylum on or after May 11, 2005. *See id.* Singh applied for relief in 2003.

F.3d 743, 749 (6th Cir. 2006); *See* 8 U.S.C. § 1231(b)(3). This burden of proof is higher than that applicable to asylum claims. *Compare Cardoza-Fonseca*, 480 U.S. at 431 (asylum claims can succeed with significantly less than a preponderance of evidence) *with Ceraj v. Mukasey*, 511 F.3d 583, 594 (6th Cir. 2007) ("clear probability" of persecution is a stricter standard than asylum's "well-founded fear" standard).

Finally, Singh also claimed entitlement to relief under the CAT. In order to establish such a claim, an applicant must show that it is more likely than not that the applicant would be tortured if removed to the proposed country of removal. *See Almuhtaseb*, 453 F.3d at 749; 8 C.F.R. § 1208.16(c)(2). Like claims for withholding of removal, CAT claims use the more stringent "more likely than not" standard. *See Ceraj*, 511 F.3d at 594.

Thus, if Singh's asylum claims fails, his withholding of removal and CAT claims must logically fail as well.[4] *See Bah v. Gonzales*, 462 F.3d 637, 643 (6th Cir. 2006) ("Because Bah cannot show that she qualifies for asylum, she cannot meet the more stringent standards required to qualify for the protections of withholding of removal or under CAT."); *Liti v. Gonzales*, 411 F.3d 631, 641 (6th Cir. 2005) ("[B]ecause the Litis failed to establish eligibility for asylum, they also cannot meet the heightened requirements for relief under CAT.").

## B.    Immigration Judge's Fact Findings

---

[4]This is not always the case. In *Singh v. Ashcroft*, 398 F.3d at 404-06, the court found that the IJ erred by conflating the petitioner's CAT claim and asylum claim. CAT claims need not be based upon any of the specific grounds that form the basis of an asylum claim (race, religion, etc.). In cases like *Singh v. Ashcroft* where a petitioner might potentially be tortured for reasons other than one of those underlying grounds, a credibility determination about the petitioner's allegations of political persecution does not suffice to resolve the CAT question. *See id.* Because here, Singh consistently connects his mistreatment to his political support of Sewa Singh, he does not raise the claim that he faces torture unrelated to his political affiliation.

The IJ gave several reasons for finding that Singh was not credible. First, the court found Singh's testimony concerning his own Sikh religion to be "quite inadequate." The court noted that the only way Singh characterized Sikhs when asked to distinguish them from other peoples in India was by describing their appearance. The IJ also found that Singh had no good explanation for why his own beard was short, despite being safely in the United States for over four years at the time of the hearing. Second, the court noted Singh's inconsistent testimony about the date he joined the Akali Dal party – in Singh's written application, he stated that he first joined in 1997, in his hearing testimony, he said 2002. Singh explained the discrepancy by stating that he had made a mistake or could not understand during the hearing, and maintained that he had joined in 1997. Third, the court found that Singh had been inconsistent regarding the date of his first arrest because in his application he had indicated that the date of the arrest – June 6th – was Ghallughara (holocaust) day, but when asked at the hearing whether the date was significant to the Sikh community, he answered no. Fourth, the court found that Singh was inconsistent about who paid the three bribes to get him out of prison. Singh's hearing testimony that his family must have paid the bribe to police did not match a letter he submitted in evidence from a village leader, Baldev Singh, stating that *he* had paid the bribe each time. Fifth, the court found that Singh failed to adequately clear up a discrepancy in his account of the amount of time he was in custody following his second arrest: in the written statement of his asylum application, Singh stated that he was released after two weeks, but, in his hearing testimony, Singh said he was held from January 15th through January 23rd. When asked about the difference, Singh confirmed the dates, and asked about the eight-day difference, "Doesn't it make two weeks?" Sixth, the court noted that Singh had referred to the planted drug as "poppy husk" in his asylum application, but called it "post" in the hearing. The court allowed that both

names might refer to the same substance, and concluded the evidence was not clear. Seventh, the court found it implausible that after Singh was told by the police to leave Punjab, and he did as they told him, that the police would nevertheless pursue him at the temple in Delhi. The judge was dissatisfied with Singh's explanation at the hearing that "Partab Singh has his people all around to find anybody anywhere . . . and they can look for you and they can find you out."

In addition to finding Singh not credible, the IJ cited deficiencies in the corroborating evidence as also leading to the conclusion that Singh failed to sufficiently demonstrate past persecution. The court only gave "limited weight" to letters submitted by Sewa Singh (the leader Singh supported) and Baldev Singh (who Singh says is the head of the village) because the letters provided no dates or details concerning Singh's arrests, provided no other specific information about his mistreatment, and were just the "general conclusory sort of letter."[5] The court also found the two small photographs that Singh submitted to substantiate his injuries to be of limited value. The court noted that while one of the photographs appeared to depict Singh with a swollen or broken collarbone, there was no evidence of the photograph's date and/or the circumstances surrounding the injury. The court found that in the other photograph – purportedly showing Singh's knee injuries – the injuries were not apparent, and the picture did not show the head or torso to help identify it as Singh.

Finally, the court explained that even accepting that Singh at one time possessed a well-founded fear of persecution, he no longer did. The court pointed out that in 2004 (the year after Singh left India), the country elected its first Sikh prime minister. The court noted the "recent

_____

[5]The court did note, however, that each of the letters contained a piece of more specific information that conflicted with Singh's testimony. Sewa Singh's letter states that Singh joined the party in 1997. Baldev Singh's letter states that Baldev paid for Singh's bribes.

elections in February 2007 in the Punjab," including the fact that the Akali Dal won "the largest number of seats in the assembly," and that the "chief minister" in the Punjab is the leader of the Akali Dal party. The court concluded that any small risk to Singh resulting from his relationship to Sewa Singh "would be more personal rather than political or religious given current country conditions in India and the Punjab."

## C. Analysis

The IJ's decision is potentially problematic in several respects. First, some inconsistencies listed by the court do not go to the heart of Singh's claim that he faced persecution as a member of the Akali Dal party and supporter of Sewa Singh. The discrepancies concerning 1) the significance of the date of Singh's first arrest,[6] 2) precisely who paid the police to release him, and 3) the substance "post" versus "poppy husk," are all minor and cannot reasonably be understood as attempts by Singh to enhance his claims. *See Sylla*, 388 F.3d at 926.

Other inconsistencies – like the year Singh joined the Akali Dal party, and Singh's account of the amount of time he was in custody following his second arrest – might be legitimately understood to go to the heart of the matter. Still, since Singh's allegiance to Akali Dal is not in question, Singh's account of having joined the party in 1997 rather than in 2002 does little to boost his substantive claim.

The second potentially problematic aspect of the IJ's decision is the court's focus on the degree of Singh's Sikh religiosity. Singh's claims do not rely upon being a Sikh. He maintains that

---

[6]One could argue that the significance of Singh's June 6 date of arrest goes to the heart of Singh's claim because Ghallughara Day is supposed to be significant to Sikhs, and if he is an actual Sikh, or a practicing Sikh, he should know. However, as we explain below, Singh's Akali Dal membership, rather than his Sikh religion, is the salient feature for our purposes.

he was persecuted because of his membership in Akali Dal, a political party apparently made up of Sikhs. The Congress Party – to which Singh's alleged oppressor Partab Singh belongs – also includes Sikhs. In fact, the record does not reflect any individual being of any religion other than Sikh. Further, Singh's counsel made clear in closing argument that Singh's political party, not his religion, was the reason for his treatment.[7] Under these circumstances, the court's mischaracterization of Singh's claims as being based on "his political opinion . . . *and/or his Sikh religion*." A.R. at 61 (emphasis added), its finding that Singh's description of the Sikh religion was "quite inadequate," its observations about the length of Singh's beard, its questions about whether Singh wore a turban or steel bracelet, and its citation of the election of India's first Sikh prime minister are all inapposite.

However, even setting aside the factors mentioned by the IJ that are not properly considered, we cannot conclude that any reasonable adjudicator would be compelled to conclude that Singh's allegations of past persecution are credible and entitle him to refugee status. *See Singh v. Ashcroft*, 398 F.3d at 401.

The IJ's finding implausible Singh's testimony that after Singh left Punjab as he was told to do by supporters of Partab Singh, he would still be pursued by Partab-supporting police in Delhi, does go to the heart of Singh's claim. Further, Singh's explanation – that Partab Singh has "people all around to find anybody anywhere" is not particularly persuasive. At the hearing Singh's counsel emphasized that the Partab Singh – Sewa Singh power struggle was a local, community-based

---

[7] Singh's counsel argued, "it is true that India has a Sikh prime minister, but the animosity here is intra-community . . . [between] Sewa Singh and Partab Singh, both of whom are of the Sikh religion. So he is not claiming religious persecution . . . the real claim is political persecution."

phenomenon. Singh did not adequately explain Partab Singh's supposed broad reach such that any reasonable adjudicator would be compelled to find him credible on this point.

Further, the IJ noted Singh's "non-responsiveness" and that he "did not appear to answer all questions sincerely and forthrightly." Indeed, there are several examples from the hearing where Singh appeared to duck a question, or answer less than thoroughly.[8] Although the conclusion that Singh was being evasive may not be the full and thorough explanation of what occurred, there is certainly record evidence to support that conclusion. Accordingly, any reasonable adjudicator would not be compelled to find otherwise.

The IJ's dissatisfaction with the other evidence submitted by Singh is also adequately supported by the record. As the court pointed out, the two letters that Singh submits in support are

---

[8]Singh was not straightforward concerning the results of various elections.

| Lawyer: | And the Akali Dal party won the largest amount of seats in that election, correct? |
| Singh: | Yes, Akali Dal won and Patrab Singh also won but Sewa Singh lost. The second time again Partab Singh won and Sewa Singh was not there, Sewa Singh lost. |
| Lawyer: | I don't know what do you mean the second time. I am trying to speak about the most recent elections. |
| Singh: | Yes, in the current elections, too. Partab Singh won and Sewa Singh lost. Yes Partab Singh won again and Sewa Singh lost again and in the center, the congress party is in power. |

(A.R. 149-50.)

| Judge: | . . . Sir, isn't it true that the prime minister of the whole country of India is a Sikh and that he is the first Sikh to ever hold that position? |
| Singh: | Yes, yes, Partab Singh is the person from the congress and congress has power and Partab Singh has ruined by life real bad. He has just ruined my life. |

(A.R. 156.)

-13-

brief and somewhat vague. Regarding the three arrests that form the basis of Singh's claim, Sewa Singh's letter says only that "Balwinder Singh was arrested three times on false excuses and tortured only to press him to give a statement against me." Also, Sewa Singh's letter is years old – it was written in 2003 – making at least one of its statements about the danger of the area likely no longer true.[9] Baldev Singh's letter is one paragraph and not dated. He simply states, "Balwinder Singh was also arrested three times and tortured by police." Further, the photocopies of the pictures of Singh's injuries included in the Administrative Record are extremely poor and, as a result, this court cannot draw substantive conclusions about what they depict. Accordingly, the strength of this evidence would not compel any reasonable adjudicator to disagree with the IJ's conclusion.

Finally, Singh's various accounts of who was in power in his village are confusing. This is of central importance to Singh's claim because his entire claim of persecution – both past and future – hinges on the understanding that Partab Singh is in power, and his followers, including the police, will persecute Singh.

Singh's brief states that Partab Singh and the Congress party won the June 2002 "local election[]". It is not clear what Partab Singh's position was at the time, although in his hearing testimony Singh calls him a "minister." By the time of his 2007 hearing, Singh seemed to say that two different individuals were currently in charge of the village, neither of whom was Partab Singh.[10]

---

[9]Sewa Singh's states, "In Punjab it is rule of police or Maharaja, the C.M., who is bent on to disturb the peace of Punjab by detaining all Akalis on false allegations." But in subsequent elections, the petitioner's party, Akali Dal, won a plurality of the seats in Punjab.

[10]*Compare* A.R. at 118 (Sewa Singh is the leader of the village "at the moment"), *with* A.R. at 129 (Baldev Singh is the sarpanch (head) of the village.) It also appears from Baldev Singh's letter that he was the head of the village when he drafted it. Although the letter is not dated, it was submitted with Singh's asylum application which was filed in 2003. (A.R. 272.)

However, despite indicating that Sewa Singh or perhaps Baldev Singh is the local leader as of 2007, Singh also stated that in the February 2007 elections, Partab Singh won and Sewa Singh lost in his "area." Singh maintains that his life would be "like hell" if he were to return because "Partab Singh who is from the Congress Party is still in power."

Working through these statements, it is clear from Singh's testimony that the man he claims is behind his persecution, Partab Singh, was in power in some form in 2002. Although it is not clear what level of government Partab Singh occupied, no evidence conflicts with the understanding that Partab Singh was "in power." There is evidence that by 2003 (the time of Singh's application), Baldev Singh was the leader of the village. It is conceivable, though, that Partab Singh may still have been "in power" – so long as he was not in the village leader position, there is no evidence conflicting with the general proposition that Partab Singh was somehow "in power" in 2003.

However, by the time of Singh's 2007 hearing, it is not at all clear what position of power Partab Singh occupied. In his brief to this court, Singh refers to three levels of governmental power – the national government of India, the state-level government of Punjab, and "local politician[s]." Since Singh did not testify about state or national politics, his testimony about the various individuals who were in charge locally could be understood as contradictory, offering three different individuals – Partab Singh, Sewa Singh, and Baldev Singh – as occupying the same local leader position. Alternatively, there may be multiple layers of "local" leaders, consisting of *both* individual leaders of each village, *and* broader leaders who have power over multiple villages. If this is the case, then, it is conceivable that Partab Singh could have been in power the whole time Singh's

-15-

application was pending.  This would still leave the conflict that Singh seems to indicate that both Sewa Singh and Baldev Singh held the position of village leader during the same time.[11]

In any case, the evidence about who occupied positions of power during the pendency of Singh's petition for asylum is confusing.  While it is possible to conclude that Partab Singh remained in at least some position of political power throughout, other conclusions may be drawn as well. Accordingly, Singh's testimony on this topic would not compel any reasonable adjudicator to disagree with the IJ's conclusion.

In light of these legitimate reasons supporting the IJ's findings that Singh testimony was not wholly credible, and that he did not produce sufficient evidence to meet his burden to show past persecution, we cannot conclude that any reasonable adjudicator would find contrary to the IJ's determination concerning Singh's credibility and refugee status.  On that same basis, Singh's other claims fail.  *See Bah*, 462 F.3d at 643 ("Because Bah cannot show that she qualifies for asylum, she cannot meet the more stringent standards required to qualify for the protections of withholding of removal or under CAT."); *see also El-Moussa v. Holder*, 569 F.3d 250, 256-57 (6th Cir. 2009) (IJ's finding, under stricter review of REAL ID Act, that petitioner did not testify credibly "precludes her from meeting any of these burdens of proof").

### III.  CONCLUSION

The record before us would not compel any reasonable adjudicator to deem credible Singh's allegations of past persecution.  Accordingly, we **DENY** Singh's petition for review of the BIA's decision.

---

[11]Of course, since both Sewa and Baldev are fellow Akali Dal members, this conflict is of lesser consequence.