NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0463n.06

**No. 09-3448**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Jul 30, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| ABDOULAYE M. SY, | ) | |
| | ) | ON REVIEW FROM THE |
| Petitioner, | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| v. | ) | |
| | ) | |
| ERIC H. HOLDER, JR., Attorney General, | ) | **O P I N I O N** |
| | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**Before: GILMAN and WHITE, Circuit Judges; and WATSON*, District Judge.**

**HELENE N. WHITE, Circuit Judge.** Petitioner Abdoulaye Sy seeks review of a Board

of Immigration Appeals (BIA) order dismissing his appeal from the Immigration Judge (IJ) decision

denying his claims for asylum and withholding of removal pursuant to the Immigration and

Nationality Act, and for relief pursuant to the United Nations Convention Against Torture (CAT).

We **DENY** Sy's petition for review.

**I.**

**A.     Sy's Account**

Sy is a native and citizen of Mauritania and identifies himself as belonging to the Black

Fulani race/ethnic group. Sy has a wife and four children, who now live in Senegal.

---

*The Honorable Michael H. Watson, United States District Judge for the Southern District
of Ohio, sitting by designation.

Born in 1962, Sy did not go to school, and became a farmer.  (A.R. 48-49.)  He and his family lived in a mud house on his modest farm.  (A.R. 49.)  Sy testified that his parents had previously had problems with the authorities in Mauritania, who were White Arabs (White Moors), and that the same authorities caused problems for him.  Specifically, in 1989, a group of soldiers and customs officials with weapons came to his farm at night and said they would seize his family's land because the family was "not from there," despite the fact that Sy's farm was passed down from his grandfather.  (A.R. 50-53.)  The soldiers killed one of the family's lambs and beat Sy with whips, leaving a scar on his hand.  When asked at the removal hearing how often the authorities would come to his house, Sy responded that they came so often he could not say how many times specifically.  (A.R. 53.)  Sy also testified that he was arrested in 1989 and held for three days.  (A.R. 57.)

Sy described the next time that he had problems as occurring on August 7, 2001, when many individuals, some in uniform, some in civilian clothes, came to his home at night.  (A.R. 54.)  The individuals told Sy that he did not belong in Mauritania and beat him up, along with his family.  He and his family were taken to the river along with other families and put in small boats to cross the border to Senegal.  (A.R. 55.)  Sy and his family crossed in different boats, but were together in the Diatar Reguee Camp in Senegal (A.R. 56, 427.)

Sy testified that he stayed in Senegal for only 13 days.  (A.R. 58.)  Sy's sister gave him some jewelry, with which he was able to obtain passage to the United States.  (A.R. 58-59.)  A man named Pape Joe Diop brought Sy on a flight to New York.  (A.R. 59.)  Diop gave Sy a passport (with someone else's name, but Sy's picture) to use and Diop was the one who spoke with immigration officials in New York.  (A.R. 60-61.)  After Diop and Sy entered the country, Diop took Sy's plane

ticket and passport back. (A.R. 61.) Sy testified that he arrived in the United States on August 20, 2001. (A.R. 61.)

Sy also testified that sometime after he had arrived in the United States, he received a police summons that was sent to him by someone who had lived in the same area as he had in Mauritania. (A.R. 61-62.) The summons is dated August 14, 2001, and orders Sy to report to the police station concerning a personal matter. (A.R. 197-98.) The individual who sent him the summons told Sy that "they" were asking where he was and the individual told them that he did not know. (A.R. 63.) Sy testified that he is afraid that if he goes back to Mauritania, he will be killed. (A.R. 63.)

## B.    Immigration Proceedings

In January 2002, Sy filed an application for asylum and withholding of removal. (A.R. 428-36.) The application was referred to an IJ. Sy was served with a Notice to Appear on April 28, 2004, charging him with removability under 8 U.S.C. § 1227(a)(1)(A), as an immigrant who, at the time of admission, did not possess a valid entry document. (A.R. 464.) Sy conceded removability and filed an amended application for asylum, withholding of removal, and protection under the CAT in November 2007. (A.R. 137, 417-26.)

In December 2007, the IJ held a hearing on Sy's removal proceedings. After the hearing, the IJ issued an oral decision denying Sy's application and ordering him removed to Mauritania. (A.R. 116-24.) The IJ found Sy's testimony not credible, and also concluded that Sy had not proved that he filed his asylum application withing one year of the date that he entered the country. On March 27, 2009, the BIA issued a brief opinion and order dismissing Sy's appeal. The BIA decision addressed only the IJ's credibility conclusion and concluded that the IJ had not committed clear error. Sy timely sought review in this court.

**II.**

**A.      Legal Standards**

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination. To the extent that the BIA adopted the immigration judge's reasoning, however, we also review the immigration judge's decision." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (internal citation omitted). Questions of law are reviewed de novo, while factual findings (including credibility determinations) are reviewed for substantial evidence. *Id.*; *Hassan v. Gonzales*, 403 F.3d 429, 434 (6th Cir. 2005). Under a substantial-evidence standard, factual findings are to be treated as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Hassan*, 403 F.3d at 434.

Under the INA, asylum can be granted to an alien who qualifies as a "refugee," defined as someone "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [his or her home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An applicant is required to show three things to demonstrate a well-founded fear of future persecution:

> (1) that he has a fear of persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) that he is unable or unwilling to return to that country because of such fear.

*Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (quoting *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004)). To show a "reasonable possibility" of persecution, the applicant need not prove persecution by a preponderance of the evidence. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 431

(1987) ("One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.").

Similar to asylum, eligibility for withholding of removal is based on a fear of persecution because of one's race, religion, nationality, membership in a particular social group, or political opinion. *See Singh v. Ashcroft*, 398 F.3d at 401. In contrast to asylum, which is a matter of the Attorney General's discretion, if the applicant meets the requirements for withholding of removal, relief is mandatory. *Id.* However, in order to qualify for withholding of removal, the applicant must meet a higher standard—a "clear probability," or more likely than not, that he would be subject to persecution in the proposed country of removal. *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006); *see* 8 U.S.C. § 1231(b)(3).

In order to establish a CAT claim, an applicant must show that it is more likely than not that he would be tortured if removed to the proposed country of removal. 8 C.F.R. § 1208.16(c)(2). Torture is "an extreme form of cruel and inhuman treatment." 8 C.F.R. § 1208.18(a)(2). "Specifically, it is 'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted' to extract information, punish, intimidate, coerce, or otherwise discriminate, 'when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Haider v. Holder*, 595 F.3d 276, 289 (6th Cir. 2010) (quoting 8 C.F.R. § 1208.18(a)(1)). An applicant need not show that the torture is based on one of the five protected grounds. *See Almuhtaseb*, 453 F.3d at 751.

**B.** **Analysis**

1. BIA Decision

The BIA concluded as follows:

We find no clear error in the Immigration Judge's adverse credibility finding. In that regard, the Immigration Judge identified substantial discrepancies within the respondent's testimony at his individual hearing and between his testimony at his individual hearing and his application for asylum and withholding of removal (Form I-589) which are indeed present in the record of proceeding. For example, regarding incidents that occurred in 2001, the respondent omitted any testimony regarding any detention on direct examination. On cross examination, he explicitly stated that the only time he was ever detained was in 1989, and it lasted for 3 days. Then, he testified that he was detained in 2001 for approximately 2 days, but he later said he was not detained in 2001. However, he wrote in his application for asylum and withholding of removal (Form I-589) that he was detained in August 2001. The respondent failed to adequately and sufficiently dispute these discrepancies either before the Immigration Judge or on appeal.

(internal citations omitted).

Among the other "substantial discrepancies" that the BIA referenced, the IJ cited the fact that Sy's first asylum application stated that he was arrested and detained in 1989, 1990, and 1999, but that Sy did not testify to being arrested or detained in 1990 or 1999 at the hearing. The IJ also found Sy's testimony about "the 1989 incident" to be inconsistent. (A.R. 121.) Sy testified on cross-examination that he went to the hospital after the 1989 beating. (A.R. 73.) But Sy also testified that he was taken to jail immediately after the 1989 arrest. (A.R. 74.) The IJ found these statements to conflict. (A.R. 121); *see also* A.R. 74 ("Well sir, how could you go to the hospital the next day if you were also taken to a prison?"). The IJ also found it implausible that the Mauritanian authorities would evict Sy from the county, then only seven days later issue a summons directing him to report to a Mauritanian police station. (A.R. 122.) The IJ noted that Sy had produced no corroborating evidence about the summons, including how he got it, why the police gave it to Sy's friend to send, etc. (A.R. 122.) Finally the IJ noted the lack of any statements from Sy's wife and sister, with whom he is in contact, to corroborate any aspect of his account. (A.R. 122.)

Although at least one of the agency conclusions is problematic,[2] several others are not. Thus, we cannot conclude that any reasonable adjudicator would be compelled to find that Sy is credible. *See Singh*, 398 F.3d at 401.

Sy's testimony regarding a 2001 arrest was deeply inconsistent. On cross-examination, he first denied being imprisoned any time other than in 1989 (A.R. 76). He then stated that he was imprisoned in 2001 (A.R. 76), only to testify immediately thereafter that he was not imprisoned in 2001 (A.R. 77). He also offered the general disclaimer that he sometimes forgot what happened to him in Mauritania because of the problems he went through there. (A.R. 76.)

Further, despite the claim in Sy's first asylum application that he was arrested and detained in 1989, 1990, and 1999, Sy did not testify on direct examination to being arrested or detained in 1990 or 1999 at the hearing. Sy compounded this omission on cross-examination by being

---

[2]It is unfortunate that one of the bases for the BIA decision was the "fact" that Sy stated in his asylum application that he was detained in August 2001, but testified to the contrary at his hearing. Both the IJ and cross-examining counsel pressed Sy to explain the difference between his testimony at the hearing (omitting any mention of a 2001 arrest) and his asylum application.

The statement in Sy's application at issue is his response to the question, "Do you fear harm or mistreatment if you return to your home country?" He answered "I am afraid that if I return to Mauritania, I will again be detained, imprisoned, beaten, tortured, or even killed. *When I was forced to leave the country in August 2001, I had been detained, imprisoned[,] and brutally mistreated and my land had been stolen.* I have since learned that police continued to look for me after I left and that I was ordered to appear at the police station." A.R. 421 (emphasis added).

Interpreting those words to mean that those things occurred only in August 2001 is an unnecessarily narrow reading. Because Sy left Mauritania for good in August 2001, an alternative interpretation of the statement is that Sy is listing the various hardships that he had experienced during the entire time that he lived there. Understanding Sy's account to refer more broadly to all of the difficulties he experienced while in Mauritania makes sense, particularly in light of the question posed – to show his fear of harm or mistreatment Sy would have every reason to reference *all* of the bad things that happened to him rather than just the bad things that happened to him in the final instance.

It is worth pointing out that this (poor) reason for concluding that Sy was not credible is distinct from the (legitimate) reason, described later in this opinion, that Sy's testimony on the stand about the alleged 2001 arrest was *internally* inconsistent.

consistently non-responsive to the question whether he was ever taken to prison on any other date besides 1989 and possibly 2001. (A.R. 77-79.)

Finally, the IJ's understanding that Sy was inconsistent in testifying about the incidents in 1989 is legitimate, if somewhat less strong. The IJ seemed to understand Sy's testimony on cross-examination to be that he both went to jail and went to the hospital immediately after the same event in 1989. This conclusion necessarily depends upon the understanding that only one significant event occurred – "the 1989 incident," as the IJ put it. (A.R. 121.) But Sy clarified that the day he went to the hospital with a finger injury after being beaten by authorities and the day he went to prison were "different time[s]." (A.R. 75.) Although the IJ clearly rejected this explanation, he did not say why, and the explanation did not explicitly conflict with Sy's other testimony. Still, Sy's testimony on this subject also *supports* the IJ's conclusion that he was not credible. Sy's explanation that there were two separate events in 1989 did not come out until he was confronted with potentially conflicting information on cross-examination. The late-breaking and reactionary nature of Sy's testimony on this core subject could well have damaged Sy's credibility.

In light of these inconsistencies, it was reasonable for the IJ to look to corroborating evidence in evaluating whether Sy had met his burden of proof. *See Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004) (acknowledging that an applicant's credible testimony without corroboration may be sufficient to sustain the burden of proof, but "where it is reasonable to expect corroborating evidence . . . [t]he absence of such corroborating evidence can lead to a finding that an applicant has failed to meet [his] burden of proof"); *Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004) (holding that where an applicant's testimony was inconsistent, a fact finder could reasonably find testimony,

"absent corroboration," was insufficient). Sy offered little to no corroboration,[3] despite the fact that he testified to still having contact with his wife and sister.

Sy argues that the inconsistencies identified by the IJ and the BIA do not go to the heart of his claim. To the contrary, Sy's claim is that the White Moor authorities in Mauritania persecuted him by physically harming him, arresting him, detaining him, and eventually removing him from his land because of his status as a Black Fulani. Whether he was imprisoned in connection with a certain event and the total number of times that he was arrested and/or detained are central components of Sy's claim for asylum. This is especially so because, despite claiming that the authorities came to bother him "very often" (A.R. 54), Sy testified to only two specific occurrences – in 1989 and August 2001 – on direct examination (and, when pressed on cross-examination, referenced one additional incident in each of those years).

Sy's other arguments are also unavailing. He argues that implausibility alone cannot form the basis of an adverse credibility finding. But the IJ's credibility finding was based largely on inconsistencies in Sy's testimony – the IJ singled out only one aspect that he thought was "implausible": that the police issued Sy a summons to appear before them in Mauritania only seven days after removing him from the country. In any case, this argument concerns a claim not before us. The IJ's apparent distrust of the timing of the summons relates to the IJ's suspicion concerning the dates Sy gave for arriving in the United States, which led to the judge's eventual conclusion that Sy had not proved that he had filed his asylum application within one year of arriving. But, we do not consider that conclusion here because the BIA did not rely on untimeliness as a basis for its affirmance.

---

[3]We note that Sy did produce a copy of the summons document, although he did not provide a clear account of its delivery.

Sy also argues that any inconsistencies with his original asylum application should not be given much weight because that application was submitted pro se. But the IJ relied upon Sy's original application only with regard to a single inconsistency among the several problems it noted. Even disregarding Sy's original application, his testimony at the hearing was internally inconsistent, at times non-responsive, and lacked corroboration.

Because Sy's asylum claim fails, his withholding of removal and CAT claims fail as well. *See El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("The IJ's finding that El-Moussa did not testify credibly precludes her from meeting any of [the] burdens of proof [for asylum, withholding of removal, or protection under CAT]."); *Bah v. Gonzales*, 462 F.3d 637, 643 (6th Cir. 2006) ("Because Bah cannot show that she qualifies for asylum, she cannot meet the more stringent standards required to qualify for the protections of withholding of removal or under CAT.")

2.      New Evidence

Finally, Sy urges us to consider the effect of a 2008 military coup in Mauritania.[4] We may not review claims that are not administratively exhausted. *See* 8 U.S.C. § 1252(d)(1). Accordingly, we may only consider "the administrative record on which the order of removal is based," 8 U.S.C. § 1252(b)(4)(A). Further, we cannot "order the taking of additional evidence." 8 U.S.C. § 1252(a)(1). Thus, we may not consider Sy's arguments concerning the effect of the 2008 coup. *Cf. Ly v. Holder*, No. 09-3031, 2010 WL 1780261 at *5 (6th Cir. May 4, 2010) (refusing to take judicial notice of or consider extra-record information about the 2008 coup in Mauritania). The

---

[4]Sy originally attached information about the coup as addenda to his brief in this court. This court granted the government's motion to strike the addenda because the documents were not a part of the administrative record in this case. *See Gishta v. Gonzales*, 404 F.3d 972, 979 (6th Cir. 2005) (refusing to consider extra-record information).

proper procedure is for Sy to file a motion to reopen with the BIA to consider the new evidence. *See*

8 C.F.R. § 1003.2(c)(1).

### III.

We cannot conclude that any reasonable adjudicator would be compelled to find contrary to

the BIA's determination. Accordingly, we **DENY** Sy's petition for review of the BIA's decision.